[No. 59754-5.   En Banc.   January 6, 1994.]

A. DEANE BURNSIDE, *Respondent*, v. SIMPSON PAPER COMPANY, *Petitioner*.

94

*Ryan, Swanson & Cleveland,* by *John P. Mele, Michael R. Rayton,* and *Craig E. Schuman,* for petitioner.

*Jeffrey L. Needle, E. Douglas Pibel, Jr.,* and *Paul G. Gillingham,* for respondent.

UTTER, J. — Simpson Paper Company appeals from a Court of Appeals decision affirming a judgment against it in

favor of A. Deane Burnside, a former employee. Simpson Paper assigns error to the trial court's application of Washington law, its admission of Simpson's management guide to support the breach of implied contract claim, the admission of evidence of other terminations, and the sufficiency of the evidence supporting the jury verdict. Simpson Paper also asserts lack of subject matter jurisdiction. We affirm the trial court and Court of Appeals.

Burnside worked for Simpson Timber and Simpson Paper Companies from 1966 until he was fired in November 1984. He worked out of Seattle for most of these years and received excellent job evaluations. Report of Proceedings vol. 3, at 485-92. As pulp marketing manager, Burnside traveled extensively overseas. In 1982 he was transferred from Simpson Timber to its wholly owned subsidiary, Simpson Paper. With this transfer, John Fannon, president of Simpson Paper, became Burnside's immediate supervisor. Burnside was a member of the company's senior management staff. After his transfer, Burnside continued to work out of Seattle, but in 1983, at Fannon's insistence, he moved to San Francisco, where Simpson Paper is headquartered. Burnside's wife, Carol Burnside, remained in Washington, where she worked for a consulting business she owned with Burnside, Evergreen Consulting.

A significant portion of Burnside's work involved the marketing in Japan of pulp from a California mill. Simpson Paper employed Price & Pierce International as agents to help with this marketing. Price & Pierce in turn employed Katsumi Sasaki, a Japanese national, to work on Simpson's behalf in Japan. Burnside traveled to Japan two or three times a year and communicated, through a Price & Pierce agent in the United States, with Sasaki by Telex. In the early 1980's, Price & Pierce hired Carol Burnside and Evergreen Consulting to handle communications between Simpson and Sasaki.

In 1983, Fannon and Burnside traveled together to Japan on a business trip. Fannon would later testify that during this trip he became concerned about Burnside's performance

and decided to return to Japan without Burnside. Fannon did so in November 1984. Fannon testified at trial that Sasaki and others told Fannon that Burnside was hurting Simpson's image and business. There were also complaints about Carol Burnside's attendance at business meetings. Fannon returned from the trip to San Francisco on Saturday, November 17, 1984. He spoke with the chairman of Simpson Paper, Furman Mosley (who was also vice-chairman of Simpson Timber) on Sunday. Report of Proceedings vol. 3, at 494, 497. When Burnside came to work on November 19, Fannon met with him and summarily terminated his employment. Burnside testified he had always received excellent evaluations and received no warning that his behavior or skills were lacking.

Simpson Paper subsequently worked out a severance package for Burnside. Burnside submitted a letter of resignation, and the company continued his salary and medical benefits for 6 months, paid his move back to Seattle, and purchased his San Francisco condominium. Deposition of Burnside exhibits 2, 3 (Apr. 15, 1987); Clerk's Papers, at 998-99. At the end of the 6-month period, Burnside took early retirement. Deposition of Burnside exhibits 17-21 (Apr. 15, 1987). At the time of his termination, Burnside was 58 years old and had been earning approximately $7,000 a month.

Burnside was replaced by Robert Anderson, who was then 33. Anderson had been the company's manager of marketing services and product development. He took on the pulp sales portion of Burnside's job, helping to complete Burnside's work after the dismissal. In his new position, Anderson initially earned $4,900 a month. In 1989 his salary was $90,000, and he received a $59,000 bonus. Report of Proceedings vol. 10, at 1622, 1624. Another employee, Robert Millard, vice-president of operations, took over the portion of Burnside's duties which involved purchasing pulp for use in Simpson Paper's own mills. Report of Proceedings vol. 8, at 1288-89. Millard was 53 years old at the time. Report of Proceedings vol. 8, at 1288-89.

On July 18, 1986, Burnside filed suit against Simpson Paper and Simpson Timber,[1] alleging wrongful termination and age discrimination. Clerk's Papers, at 1. Simpson Paper moved for summary judgment on the basis that Burnside had failed to exhaust his administrative remedies in California. Clerk's Papers, at 15. Burnside filed a cross motion for summary judgment on his breach of contract claim. Clerk's Papers, at 1000, 1506. Simpson made various other motions for partial summary judgment, some of which were granted by the trial court. The court denied the company's motion to dismiss the age discrimination and implied contract claims, however. Clerk's Papers, at 1617-20.

After a monthlong trial, the jury found for Burnside on both of his alternate theories at trial, age discrimination and breach of implied contract. Clerk's Papers, at 1008. He was awarded a verdict of $993,627. On Burnside's motion, the court also awarded him $158,393 in prejudgment interest, and attorney fees and costs of $152,922. Clerk's Papers, at 2426, 2430. On June 18, 1990, the court entered a $1,752,781 judgment against Simpson Paper. Clerk's Papers, at 2449. The Court of Appeals affirmed, *Burnside v. Simpson Paper Co.*, 66 Wn. App. 510, 832 P.2d 537 (1992), and Simpson now seeks review in this court.

## I

### SUBJECT MATTER JURISDICTION

Simpson Paper maintains that Washington's age discrimination statute, RCW 49.60, provides no subject matter jurisdiction in this case. More specifically, it maintains the Legislature's use of the word "inhabitant" in the purpose section of RCW 49.60.010 denies Washington courts subject matter jurisdiction over persons who are not Washington residents.

■ Simpson cites no authority for the proposition RCW 49.60 is a jurisdictional statute. As the Court of Appeals indicated, the Washington State Constitution confers on the superior courts broad original jurisdiction. Const. art. 4, § 6

---

[1]Simpson Timber was ultimately dismissed as a party.

(amend. 65). Exceptions to that jurisdictional grant are narrowly construed. *Orwick v. Seattle*, 103 Wn.2d 249, 251, 692 P.2d 793 (1984); *Burnside*, 66 Wn. App. at 517.

██ The Court of Appeals also reasoned, soundly, that limiting the statute's application to Washington inhabitants would effectively allow Washington employers to discriminate freely against non-Washington inhabitants, thus undermining the fundamental purpose of the act, deterring discrimination. *See Burnside*, 66 Wn. App. at 519. The court therefore interpreted the Legislature's use of the term "inhabitants" as a general reference not intended to impose a residency requirement as a jurisdictional prerequisite to bringing suit. *Burnside*, at 518.

We affirm the Court of Appeals' disposition of this issue because it comports with the purpose underlying the statute, to deter discrimination. Statutes should be interpreted to further, not frustrate, their intended purpose. *See Wichert v. Cardwell*, 117 Wn.2d 148, 151, 812 P.2d 858 (1991). The declaration section of Washington's Law Against Discrimination emphasizes the statute is to be liberally construed. RCW 49.60.020. *See also Phillips v. Seattle*, 111 Wn.2d 903, 908, 766 P.2d 1099 (1989). Similarly, RCW 49.60.030(2) provides "any" person injured by any act in violation of the chapter shall have a civil cause of action. Simpson Paper's assertion there was no subject matter jurisdiction is thus without merit.

## II

### GOVERNING LAW

Simpson Paper also challenges the trial court's choice of Washington over California law on the employment discrimination claim.[2] Our examination of pertinent case law and the respective policies underlying California and Washington law persuade us the application of Washington law was proper in this case.

---

[2] Simpson Paper does not challenge the application of Washington law on the contract claim.

## A
### The Presumptive Law

A scholar in the field of conflict of laws, Professor Currie, suggests several principles that serve as a useful starting point in choice of law analysis:

> 1. The normal business of courts being the adjudication of domestic cases, and the normal tendency of lawyers and judges being to think in terms of domestic law, *the normal expectation should be that the rule of decision will be supplied by the domestic law as a matter of course.*
>
> 2. The court should ordinarily depart from this procedure only at the instance of a party wishing to obtain the advantage of a foreign law.
>
> 3. The law of the forum, as the source of the rule of decision, should normally be displaced only by the interested party's timely invocation of the foreign law. The interested party invokes foreign law by calling attention to its relevance and its superior claim to be applied, and by informing the court of its tenor.

(Italics ours.) Brainerd Currie, *Selected Essays on the Conflicts of Laws* 75 (1963).

## B
### Washington's Approach to Choice of Law Questions:
### The "Most Significant Relationship" Standard

In an ordinary conflict of laws case, the applicable law is decided by determining which jurisdiction has the "most significant relationship" to a given issue. *Johnson v. Spider Staging Corp.*, 87 Wn.2d 577, 580, 555 P.2d 997 (1976); *Barr v. Interbay Citizens Bank*, 96 Wn.2d 692, 697, 635 P.2d 441, 649 P.2d 827 (1981); *Southwell v. Widing Transp., Inc.*, 101 Wn.2d 200, 204, 676 P.2d 477 (1984). *See generally* Philip A. Trautman, *Evolution in Washington Choice of Law — A Beginning*, 43 Wash. L. Rev. 309 (1967-1968).

In this case, however, we do not reach the choice of law question because when California's interest is examined, it does not prove fundamentally incompatible with Washington's. To that extent, this is a "false" conflict case,[3] render-

---

[3]A "false" conflict refers to a situation where the laws or interests of the concerned states are not in conflict. *See Pacific Gamble Robinson Co. v. Lapp*, 95 Wn.2d 341, 345 n.1, 622 P.2d 850 (1980). *See generally* Robert A. Leflar, et al., *American Conflicts Law* § 92, at 270-71 (4th ed. 1986).

ing the trial court's application of the presumptive local law — Washington law — proper.

## C

### A False Conflict: California and Washington Law Compared

Simpson Paper's argument that California law applies is premised on the assumption that Washington law conflicts with California's preference for the administrative resolution of discrimination disputes, and that California's interest outweighs, and therefore should displace, Washington law. The argument is unpersuasive.

■ First, Simpson has failed to show a conflict between the purposes of Washington and California law. The Legislatures of both California and Washington deem employment free from discrimination to be a civil right. *Compare* Cal. Gov't Code § 12921 (Deering 1982) *with* RCW 49.60.030(1). Both states seek to promote the same fundamental interest, deterring discrimination by businesses operating within their borders.

The Washington Legislature has declared in the purposes section of RCW 49.60:

> The legislature hereby finds and declares that practices of discrimination against any of its inhabitants because of race, creed, color, national origin, sex, marital status, age, or the presence of any sensory, mental or physical handicap are a matter of state concern, that such discrimination threatens not only the rights and proper privileges of its inhabitants but menaces the institutions and foundation of a free democratic state.

Former RCW 49.60.010.

Similarly, the California Legislature has declared under the public policy section of its California Fair Employment and Housing Act (FEHA):[4]

> It is hereby declared as the public policy of this state that it is necessary to protect and safeguard the right and opportunity

---

[4]The California Fair Employment and Housing Act (FEHA), ch. 992, § 4, 1980 Cal. Stat. 3138, 3140-65 (codified as amended at Cal. Gov't Code § 12900-12996 (Deering 1982 & Supp. 1988), is a reenactment of the Fair Employment Practices Act (FEPA).

of all persons to seek, obtain, and hold employment without discrimination or abridgment on account of race, religious creed, color, national origin, ancestry, physical handicap, medical condition, marital status, sex, or age.

Former Cal. Gov't Code § 12920 (Deering 1982).

It can hardly be said that California and Washington law are in conflict of purpose.

Second, Simpson exaggerates California's interest in the administrative resolution of employment discrimination suits. California law does not compel the administrative resolution of such suits. California law does provide a statutory administrative procedure for resolving such · claims, *see Snipes v. Bakersfield*, 145 Cal. App. 3d 861, 865-69, 193 Cal. Rptr. 760 (1983), but it does not reflect as compelling an interest as Simpson Paper maintains. Under California law, an employee may file a claim under California's Fair Employment and Housing Act. A state commission will investigate the claim and seek resolution "in confidence — by conference, conciliation, and persuasion". *Snipes*, at 866. If the commission does not pursue the claim or take action within 150 days of filing, it must issue a "right to sue" letter to the employee. *Snipes*, at 866. Only then may the employee sue in superior court under the act. *Snipes*, at 866. Employees, however, must file their complaints within 1 year of the claimed discrimination. *Snipes*, at 867. Simpson Paper maintains that Burnside's claim is time barred because he did not file his claim under the statute.

Although Burnside's cause of action may be time barred *under the statute*, Simpson Paper has not shown the claim would be barred under California law. Despite the apparently mandatory procedure under FEHA, the California Supreme Court has held failure to pursue a complaint under the act does not preclude suit. *Rojo v. Kliger*, 52 Cal. 3d 65, 801 P.2d 373, 276 Cal. Rptr. 130 (1990); *cf. Strauss v. A.L. Randall Co.*, 144 Cal. App. 3d 514, 194 Cal. Rptr. 520 (1983), called into doubt by *Rojo*.

The *Rojo* court held California's Fair Employment and Housing Act does not establish the exclusive avenue of

recovery for employment discrimination. The act supplements, rather than supplants, remedies that would otherwise be available to plaintiffs in California. Thus, an employee may proceed against an employer under the act, or outside the act, at his or her election. The court explained:

> The act expressly disclaims any intent to repeal other state laws relating to employment discrimination. Subdivision (a) of section 12993 provides: "The provisions of this part shall be construed liberally for the accomplishment of the purposes thereof. Nothing contained in this part shall be deemed to repeal any of the provisions of the Civil Rights Law or of *any other law of this state relating to discrimination* because of race, religious creed, color, national origin, ancestry, physical handicap, medical condition, marital status, sex, or age."

*Rojo*, at 73.

*Rojo* dealt with a sex discrimination claim, but its rationale extends to other forms of discrimination, including age discrimination. Since *Rojo*, at least one California appellate court has held that age discrimination claims may be brought outside the act.[5] *See Soules v. Cadam, Inc.*, 2 Cal. App. 4th 390, 3 Cal. Rptr. 2d 6 (1991) (tortious discharge in violation of public policy can be brought whenever basis of discharge violates a public policy, such as the public policy against age discrimination), *review denied* (Mar. 12, 1992).[6]

Simpson Paper's contention that California's interest requires dismissing Burnside's suit is thus without merit. Simpson has shown neither that California and Washington law are substantively in conflict, nor that California law compels the dismissal of Burnside's claim on procedural grounds.

An actual conflict between the law of Washington and the law of another state must be shown to exist before Washington courts will engage in a conflict of law analysis. *Interna-*

---

[5]*Cf. Dean v. Jet Servs. West, Inc.*, 782 F. Supp. 498, 500-01 (S.D. Cal. 1991).

[6]Even before *Rojo*, it was possible for an age discrimination claimant to circumvent the administrative scheme by requesting a right-to-sue letter, which the Department overseeing FEPA granted at the employee's request as a matter of course when settlement appeared unavailing. *See Rojo*, at 84 n.11. *See also Snipes v. Bakersfield*, 145 Cal. App. 3d 861, 868 n.3, 193 Cal. Rptr. 760, 764 (1983).

*tional Tracers of Am. v. Estate of Hard*, 89 Wn.2d 140, 144, 570 P.2d 131 (1977) (citing B. Currie, *Selected Essays on the Conflict of Laws* 176 (1963)). Simpson Paper fails to show a conflict between Washington and California law. Absent such a showing, the forum may apply its own law. *See International Tracers*, 89 Wn.2d at 144; B. Currie, at 176. Because this is a false conflict case, the trial court's application of Washington law does not constitute error.

## III

### BREACH OF IMPLIED CONTRACT[7]

Simpson Paper maintains the trial court erred in holding the Simpson management guide could modify the nature of the employment relationship. The company contends that because the guide was designed for managers it could not as a matter of law operate to alter the employment relationship between Simpson and Burnside.

■■ The argument is without merit. Generally, employment contracts indefinite as to duration may be terminated by either the employer or the employee at any time, with or without cause. *Thompson v. St. Regis Paper Co.*, 102 Wn.2d 219, 223, 685 P.2d 1081 (1984). A terminable-at-will relationship can, however, be contractually modified by an employee policy manual. *Thompson*, 102 Wn.2d at 229-30; *Swanson v. Liquid Air Corp.*, 118 Wn.2d 512, 520, 826 P.2d 664 (1992). A promise contained in an employee manual of specific treatment in specific situations may be enforceable if an employee relies thereon. *Thompson*, 102 Wn.2d at 223; *Swanson*, 118 Wn.2d at 520; *Toussaint v. Blue Cross & Blue Shield*, 408 Mich. 579, 292 N.W.2d 880 (1980).

We have recently emphasized that whether an employment policy manual issued by an employer contains a promise of specific treatment in specific situations, whether the employee justifiably relied on the promise, and whether

---

[7]The jury found in favor of Burnside on both of his alternative theories, violation of RCW 49.60 and breach of an implied contract created by the terms of the management guide. It is therefore possible to avoid reaching the contract question since the trial court and Court of Appeals can be affirmed on the statutory cause of action. We nevertheless reach the contract question in order to dispel confusion in the lower appellate courts.

the promise was breached are questions of *fact. Swanson*, 118 Wn.2d at 522 (citing *Thompson v. St. Regis Paper Co.*, 102 Wn.2d 219, 222, 685 P.2d 1081 (1984)). Only if reasonable minds could not differ in resolving these questions is it proper for the trial court to decide them as a matter of law. *Swanson*, 118 Wn.2d at 522.

The language in the guide, entitled "Simpson's Management Guide", at least arguably supports the notion it was binding on Burnside's superiors in the company, thus binding the company in its dealings with him. The guide suggests terminations will be for cause only, and will occur after warning.[8] It states in its "Introduction":

> This is the Management Guide to Simpson Paper Company. It is an authoritative source of information on organization, policy and procedures for *all levels of management*, including foremen, staff supervisors and plant managers.

(Italics ours.) Clerk's Papers, at 637.

Under "Authority", it provides:

> The statements contained in this guide constitute orders of the president to be observed *throughout the company* until a modification or withdrawal is properly authorized.

(Italics ours.) Clerk's Papers, at 639. Because reasonable minds can differ as to whether the language can be con-

---

[8]Under "Types of Terminations", the following list appears. The categories seem to be exhaustive, and indicate only terminations "for cause":

"1.2 Terminations will be classified as:

"(a) Resignations, if initiated by the employee.

"(b) Releases, if initiated by the company *for cause*.

"(c) Curtailment, if initiated by the company for reduction of work force.

"(d) Retirement, when an employee commences to receive normal, early or disability retirement benefits.

"(e) Deceased, upon death of employee." (Italics ours.)

Under "Release":

"Release will constitute an immediate termination of employment, and may be considered in instances such as misconduct, failure to return without notice on schedule from an absence . . ., *or incompetence or otherwise unsatisfactory work performance, if previous warnings have been given* and employee has had the opportunity to resign.

" . . . .

"All releases will be reviewed with the supervisor's superior and the personnel manager to determine *justification* for the release and final action to be taken." (Italics ours.) Clerk's Papers, at 774-75.

strued to apply to Burnside, and whether under the circumstances it constituted a promise upon which he could reasonably rely, it would have been error for the trial court to pass on it as a matter of law.

Simpson relies on two Division Three cases for the proposition the management guide could not as a matter of law provide the basis for a breach of an implied contract claim. *Adler v. Ryder Truck Rental, Inc.*, 53 Wn. App. 33, 765 P.2d 910 (1988), *review denied*, 112 Wn.2d 1013 (1989); *Hatfield v. Columbia Fed. Sav. Bank*, 57 Wn. App. 876, 790 P.2d 1258 (1990). The cases are not sound authority.

In *Adler* an employee brought an action for wrongful discharge. The trial court directed a verdict in the employer's favor. The Court of Appeals reversed and remanded for trial, holding that whether an employer had created an expectation of job security was a question of fact. In the course of its opinion the court stated in dictum, "In this case, the personnel manual does not create any specific expectations for employees with respect to termination *because the manual was written specifically for supervisory personnel.*" (Italics ours.) *Adler*, 53 Wn. App. at 36.

A later Division Three case, *Hatfield*, 57 Wn. App. at 883, cites *Adler* for this principle. To avoid possible confusion about the authority of *Adler* and *Hatfield*, we take this opportunity to specify that the mere fact a handbook is labeled "management guide" is not dispositive of whether a cause of action for breach of an implied contract will lie. Instead, the relevant inquiry is whether reasonable minds could differ as to whether a specific promise was made, whether the promise was justifiably relied on by the employee, and whether the promise was breached. *Swanson*, 118 Wn.2d at 524; *Thompson*, 102 Wn.2d at 233. These are questions for the trier of fact unless reasonable minds could reach but one conclusion. *Thompson*, 102 Wn.2d at 233; *see also Kohn v. Georgia-Pacific Corp.*, 69 Wn. App. 709, 850 P.2d 517 (1993). Language to the contrary in *Hatfield* and *Adler* is incompatible with Washington State Supreme Court precedent, and thus without effect.

## IV

### ADMISSIBILITY OF EVIDENCE

Simpson Paper claims the trial court erred in admitting evidence of other firings by Burnside's supervisor.[9]

■ Admission of evidence lies within a trial court's discretion. *Davis v. Globe Mach. Mfg. Co.*, 102 Wn.2d 68, 76, 684 P.2d 692 (1984); ER 403. As such, it is reviewed for abuse of discretion. *Davis*, 102 Wn.2d at 76 (citing *Goodell v. ITT-Federal Support Servs., Inc.*, 89 Wn.2d 488, 493, 573 P.2d 1292 (1978)). Discretion is abused when it is exercised in a manifestly unreasonable manner, or based on untenable grounds or reasons. *Davis*, 102 Wn.2d at 77 (citing *State ex rel. Carroll v. Junker*, 79 Wn.2d 12,482 P.2d 775 (1971)).

Here the evidence of two former Simpson employees was admitted to show Fannon had terminated others under similar circumstances as Burnside was alleging. The court permitted one employee to testify he was fired at age 53, without warning, after 25 years of employment at Simpson. Clerk's Papers, at 1868-70. The trial court also permitted Fannon to be questioned about the termination of another employee, to show the proffered reasons for his termination were untrue. See Report of Proceedings vol. 2, at 183.

Although the testimony may not have been highly probative, its admission was relevant to Burnside's claim of employment discrimination and breach of an implied contract. As such, its admission does not constitute an abuse of discretion.

## V

### SUFFICIENCY OF THE EVIDENCE

■ Finally, Simpson Paper maintains the evidence was insufficient to support a finding that Simpson discharged Burnside because of his age. Overturning a jury verdict is

---

[9]For this argument Simpson relies on *Roberts v. ARCO*, 88 Wn.2d 887, 893, 568 P.2d 764 (1977). That reliance is misplaced. Our disposition in *ARCO* was to *affirm* the trial court's exercise of discretion. There, the trial court excluded the testimony of two former ARCO employees because there was no showing they held similar positions, worked under similar circumstances, or were terminated in like manner.

appropriate only when it is clearly unsupported by substantial evidence. This court has explained:

> . . . This court will not willingly assume that the jury did not fairly and objectively consider the evidence and the contentions of the parties relative to the issues before it. *Phelps v. Wescott*, 68 Wn.2d 11, 410 P.2d 611 (1966). The inferences to be drawn from the evidence are for the jury and not for this court. *The credibility of witnesses and the weight to be given to the evidence are matters within the province of the jury and even if convinced that a wrong verdict has been rendered, the reviewing court will not substitute its judgment for that of the jury, so long as there was evidence which, if believed, would support the verdict rendered.* Burke v. Pepsi-Cola Bottling Co., 64 Wn.2d 244, 391 P.2d 194 (1964).

(Italics ours.) *State v. O'Connell*, 83 Wn.2d 797, 839, 523 P.2d 872, 77 A.L.R.3d 874 (1974).

Fannon testified Burnside's behavior was rude and unprofessional. Burnside testified this was untrue, and testified his evaluations had always been excellent. Both Fannon and Burnside had their testimony corroborated by others. The case, then, turned primarily on the credibility of the witnesses. Although there was no direct evidence Burnside was terminated because of his age, Burnside did present circumstantial evidence which, if believed, supports the verdict. Under these circumstances, Simpson Paper's challenge to the sufficiency of the evidence must fail.

The trial court and Court of Appeals are affirmed.

ANDERSEN, C.J., and BRACHTENBACH, DOLLIVER, DURHAM, SMITH, GUY, and JOHNSON, JJ., concur.

MADSEN, J. (concurring) — Although I concur in the result reached by the majority, I disagree with the majority's analysis of Burnside's implied contract claim in section III of the opinion. Under the facts of this case, Simpson Paper's Management Guide could not be used to govern the terms of Burnside's employment. By holding otherwise, the majority treats the Management Guide as if it were a general employee handbook, despite fundamental differ-

ences between the two types of documents. The trial court should have dismissed Burnside's claim for breach of implied contract.

## IMPLIED CONTRACT CLAIM

This court set out in *Thompson v. St. Regis Paper Co.*, 102 Wn.2d 219, 228, 685 P.2d 1081 (1984) two theories under which an employment manual can modify what would otherwise be a contractual relationship that is terminable at will. Terms can be implied from an employment manual under a traditional theory of implied contracts, where the court looks for the existence of offer, acceptance, and consideration. *Thompson*, at 228; *Gaglidari v. Denny's Restaurants, Inc.*, 117 Wn.2d 426, 433, 815 P.2d 1362 (1991). Alternatively, a manual can alter the employment relationship if it promises specific treatment in specific situations, thereby creating an atmosphere of job security and fair treatment and inducing employees to remain with the employer. *Thompson*, at 230; *Gaglidari*, at 433.[10]

Under neither of these theories does Simpson Paper's Management Guide qualify as a source for implied terms of contract. As to the traditional contract theory, there was no offer and acceptance. Rather, the Management Guide's terms reveal that it is a unilateral statement of corporate and management policy. There was no evidence presented to the effect that its terms were submitted to employees for their approval and acceptance.

Nor did Simpson Paper's Management Guide announce promises of specific treatment in specific areas. The Management Guide was issued only to its supervisors or department heads. Verbatim Report of Proceedings, at 283, 1642-43. Because the manual was distributed only to Simpson Paper supervisors, it did not "announce" to the general employees any "promises" of specific treatment in specific

---

[10]*Thompson v. St. Regis Paper Co.*, 102 Wn.2d 219, 685 P.2d 1081 (1984) also discusses two other alternative theories under which an at-will employment can be altered. Those theories involve either an employee giving additional consideration or a discharge that violates public policy. *Thompson*, at 233. Neither of these theories is relevant to Burnside's implied contract claim.

situations. *See Adler v. Ryder Truck Rental, Inc.*, 53 Wn. App. 33, 36, 765 P.2d 910 (1988), *review denied*, 112 Wn.2d 1013 (1989); *Hatfield v. Columbia Fed. Sav. Bank*, 57 Wn. App. 876, 883, 790 P.2d 1258 (1990). Accordingly, unlike traditional employee handbooks, which are distributed to all employees, the Management Guide cannot be construed as an employer's attempt to create an atmosphere where employees will be induced to remain with the employer.

Also, unlike traditional employee handbooks, the Management Guide does not set standards governing the conduct of general employees, nor could it, for it was not distributed to the employees as a whole.[11] In these regards, *Thompson* is quite instructive:

> *It would appear that employers expect, if not demand, that their employees abide by the policies expressed in such manuals.* This may create an atmosphere where employees justifiably rely on the expressed policies and, thus, justifiably expect that the employers will do the same. Once an employer announces a specific policy or practice, *especially in light of the fact that he expects employees to abide by the same, the employer may not treat its promises as illusory.*

(Italics mine. Italics omitted.) *Thompson*, at 230. Since *Thompson*, our cases have required that, in order to establish an employee manual contains promises of specific treatment, the manual must purport to guide employee/employer relations generally and the employee seeking to rely on provisions in such a document must present evidence that he actually knew of, and justifiably relied on, the provisions. *Stewart v. Chevron Chem. Co.*, 111 Wn.2d 609, 762 P.2d 1143 (1988); *Gaglidari*. In *Stewart*, this court found that an employee handbook, designed to govern employee/employer relations, did not contain specific promises of specific treatment and did not, therefore, form the basis for a claim of breach of implied contract. The court further noted that the

---

[11]Simpson Paper issued a traditional employee handbook, entitled the Salaried Employee Handbook, which governs these matters of general employee conduct. Clerk's Papers, at 428-633. The Salaried Employee Handbook was entirely distinct from the Management Guide. It is the Salaried Employee Handbook, not the Management Guide, to which *Thompson* more readily applies.

plaintiff presented no evidence to show that he was aware of, or relied on, the provisions of the handbook. *Stewart*, at 613-14. In sharp contrast to the facts in this case, the plaintiff in *Gaglidari* was given a copy of the employee handbook on her first day of employment. Provisions of the handbook were explained to her and she was required to sign a form acknowledging receipt of the manual and agreeing to abide by the rules. *Gaglidari*, at 428. Under these facts, this court found that a contract had been formed between the defendant and the plaintiff. By providing the handbook, with explanation, the company had made an offer which the plaintiff accepted by signing an acknowledgment and agreement form. *Gaglidari*, at 433.

Again, in contrast to the cases in which this court found a promise of specific treatment, Simpson Paper stated in the introduction to its Management Guide that the company reserves the right to amend the Guide's provisions and that the provisions will not necessarily be followed in all instances:

> The statements contained in this guide constitute orders of the president to be observed throughout the company until a modification or withdrawal is properly authorized. If unusual circumstances arise which require action contrary to them, you must obtain clearance through your supervisor from the president.

Clerk's Papers, at 639.

With this statement, Simpson Paper makes clear that the Management Guide does not announce promises which can be justifiably relied on by its employees. There can be no promise where the speaker reserves the right to alter, and even deviate from, the policies being stated. *See Shankle v. DRG Fin. Corp.*, 729 F. Supp. 122, 124 (D.D.C. 1989). This court held as much in *Stewart* when it held that a "supposed promise" in an employee handbook "may be illusory", and thus not be an enforceable promise at all, "if it is . . . discretionary on the part of the promisor". *Stewart*, at 613.

Moreover, supervisor manuals generally cannot be used to furnish contractual terms even when the contract dis-

pute, as here, is between an employer and a supervisor. *Hatfield*, at 884; *Owens v. American Nat'l Red Cross*, 673 F. Supp. 1156, 1165 (D. Conn. 1987); *Bell v. South Cent. Bell*, 564 So. 2d 46, 48-49 (Ala. 1990). As long as the employer has not distributed the supervisor manual to the general employees, the manual cannot be construed as representing promises to any employee, even to a supervisor. *Hatfield*, at 884; *Owens*, at 1165. This is especially true where the manual expressly reserves the right to change or deviate from its provisions. *See, e.g., Tritle v. Crown Airways, Inc.*, 928 F.2d 81, 85 (4th Cir. 1990).

I do not mean to imply that a supervisor manual can *never* be used as a source of contractual terms. The *Hatfield* case makes clear that even a supervisor manual can be treated as a part of the contractual relationship if the employer makes the manual generally known and available to all its employees. *Hatfield*, at 884. Under these circumstances, the employer could be construed as announcing promises to its employees in an attempt to induce greater employee performance. In short, employees could be justified in relying on such promises. *See Rosinski v. Electronic Data Sys. Corp.*, 770 F. Supp. 359 (E.D. Mich. 1990) (holding that absent an employer's actions of widely distributing a supervisor manual with intent to induce greater employee performance, the supervisor manual generally cannot be used to furnish terms of contract), *aff'd*, 935 F.2d 270 (6th Cir. 1991); *Triplett v. Electronic Data Sys.*, 710 F. Supp. 667 (W.D. Mich. 1989), *aff'd*, 900 F.2d 260 (6th Cir. 1990) (same holding as *Rosinski*).

In this case, however, there simply is no evidence that Simpson Paper took any steps to make the manual generally available to its employees. The closest that the evidence comes on this point is Burnside's testimony that he kept his supervisor manual near his desk and that it was "ready for reference by myself and other members of the department at all times". Verbatim Report of Proceedings, at 287, 289, 466.

This evidence fails to establish that Simpson Paper had acted to make the manual generally known. Burnside's tes-

timony does not establish that anyone else in his department, whether supervisors or anyone else, ever read the manual. Nor does it establish anything about the manual's availability to employees outside Burnside's department. Simply put, a supervisor manual is not "generally available" for purposes of construing an employment relationship if the evidence is simply that the manual *could* have been, but not necessarily was, used by others. *See Lakeside v. Freightliner Corp.*, 612 F. Supp. 10, 13 (D. Or. 1984).

### Conclusion

The majority holds that the facts of this case present a jury question as to whether the provisions of Simpson's Management Guide established the terms of an implied employment contract. The evidence established that the Management Guide was distributed only to management and that Burnside's copy was lying in his office, accessible for others to use. I cannot imagine a circumstance in which a judgment as a matter of law would be more appropriate.

Because Simpson Paper's Management Guide did not govern matters of general employee conduct, was not disseminated to the employees generally, and reserved Simpson's right to amend the provisions at any time, the manual could not be used in determining the terms of Burnside's employment. The trial court erred when it failed to dismiss Burnside's claim for breach of implied contract.

Reconsideration denied March 15, 1994.