[No. 32167-6-I.    Division One.    August 8, 1994.]

COMPTON D. WINSPEAR, *Appellant,* v. THE BOEING COMPANY, *Respondent.*

*Jeffrey L. Needle,* for appellant.

*Jeffrey A. Hollingsworth* and *Perkins Coie,* for respondent.

SCHOLFIELD, J. — In this wrongful discharge case, Compton D. Winspear appeals the order granting summary judgment to the Boeing Company and dismissing his claims of public policy violation, discrimination, and breach of an implied employment agreement. He argues that there were factual issues of whether Boeing's articulated reason for firing him was a pretext, whether he relied on a promise from Boeing's human resource department and, if so, whether that promise and his reliance created an implied employment agreement which Boeing breached. We affirm.

Compton Winspear began working for Boeing as an engineer in 1969. By 1989 he was one of Boeing's engineering managers working on the B-2 Stealth Bomber project for the United States Air Force. His position required him to have basic security clearance plus "program access", which is a more stringent level of security clearance.

In March 1989, Winspear was arrested and the Snohomish County Prosecutor charged him with two counts of indecent liberties and two counts of second degree rape of a child. He was released on bail to await trial. According to his affidavit, Winspear promptly notified two of his supervisors about the charges after his arrest. He also reported the arrest and the charges to a Boeing personnel manager, David Geidt.

In August 1989, Winspear's prosecution resulted in a mistrial. The prosecutor offered to drop all the felony charges if Winspear pleaded guilty to a misdemeanor charge of fourth degree assault.[1] According to Winspear, he asked Geidt before accepting the plea bargain whether his employment would be affected if his plea resulted in a jail sentence. Winspear alleges that Geidt told him he would not be fired if

---

[1]Contrary to Winspear's belief that he would have been granted work release, the Snohomish County deputy prosecutor's supplemental affidavit states that she would not have accepted any plea agreement that included work release or a suspended sentence because Winspear's criminal activity involved children.

he pleaded guilty to a misdemeanor, and he could use his 4 weeks of outstanding vacation and take an unpaid leave of absence if necessary without losing his job. In reliance on those assurances, Winspear pleaded guilty to the misdemeanor charge on December 1, 1989. Sentencing for that conviction was scheduled for March 1990.

On January 30, 1990, a Boeing security investigator met with Winspear and Richard White, Boeing's manager of security for the B-2 program. Winspear revealed the history of the charges and his guilty plea to the misdemeanor charge. He signed a written statement indicating he knew he was obligated to tell Boeing security about his arrest but he elected not to "because of embarrassment". On February 1, 1990, Boeing terminated Winspear's employment. According to Winspear, Geidt informed him he was discharged for child molestation. Winspear subsequently served 72 days of his 120-day jail sentence.

In May 1991, Winspear filed a wrongful discharge action against Boeing, alleging that Boeing violated public policy by intentionally discharging him because of his guilty plea and/or his arrest for the sexual assault charges. Boeing's answer denied Winspear had notified anyone about the arrest or the charges, denied the discharge was due to Winspear's arrest or guilty plea, and denied any public policy violation. Boeing admitted only that Winspear "was terminated from his employment because of unacceptable conduct".

Boeing subsequently moved for summary judgment, arguing that Winspear was employed by Boeing at will, he had pleaded guilty to fourth degree assault, and Boeing policy provides that employees who commit penal offenses may be disciplined, including by discharge. Boeing's motion framed the issue as whether summary judgment was warranted because (1) Winspear based his public policy claim only on WAC 162-16-060 and that regulation neither prohibits the discharge of at-will employees nor creates a claim independent of RCW 49.60, and (2) Winspear failed to report his arrest to Boeing security as required, and his extended leave

of absence while in jail would have been an independent basis for dismissal. Winspear opposed Boeing's motion and argued that he only pleaded guilty to the misdemeanor because of Geidt's assurances to him. The trial court denied the motion.

Winspear then amended his complaint to allege that Boeing's action discriminated against him in violation of RCW 49.60. He later filed a second amended complaint alleging his termination violated an implied contract because he had relied on Geidt's statements, and he would not have pleaded guilty if he had known it would result in his termination.

Boeing denied those additional allegations and filed a second motion for summary judgment asking the court to dismiss all three of Winspear's claims in his second amended complaint: the alleged public policy violation, the discrimination claim, and the implied contract claim. In that motion, Boeing alerted the trial court in a footnote that its previous motion for summary judgment challenging Winspear's public policy claim had been denied. Boeing also explained that it filed its second motion after Winspear had amended his complaint twice. Boeing asserted that Winspear still failed to state a claim for a public policy violation (this time on the ground that even if WAC 162-16-060 did state a public policy, Boeing complied with the regulation), he failed to state a claim for discrimination, and no consideration supported Winspear's implied contract claim.

Winspear opposed Boeing's motion, arguing that consideration is not necessary for an implied employment agreement under *Thompson v. St. Regis Paper Co.*, 102 Wn.2d 219, 685 P.2d 1081 (1984). He also asked for CR 11 sanctions against Boeing on the grounds that Boeing's second summary judgment motion duplicated its first one and Boeing's counsel intentionally failed to discuss *Thompson* as the controlling law. In response, Boeing distinguished the two motions and distinguished *Thompson*.

After a hearing, the trial court granted Boeing's second summary judgment motion. Winspear appeals.

I

## Implied Employment Contract Under *Thompson*

We first decide whether summary judgment was proper as a matter of law because the parties did not have an implied contract under *Thompson*.[2] Winspear argues that under *Thompson* an employer's oral promises, as well as policies and procedures set out in written employment manuals, can form an implied employment contract modifying an at-will employment agreement. Boeing maintains that *Thompson*'s exception to the common law rule regarding at-will employment agreements applies only to written employment manuals.

In reviewing a grant of summary judgment, an appellate court places itself in the trial court's position and views the evidence and all reasonable inferences from it in the light most favorable to the nonmoving party. *Swanson v. Liquid Air Corp.*, 118 Wn.2d 512, 518, 826 P.2d 664 (1992). Summary judgment is appropriate

> if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

CR 56(c); *Del Guzzi Constr. Co. v. Global Northwest Ltd.*, 105 Wn.2d 878, 882, 719 P.2d 120 (1986). Summary judgment should be granted only if reasonable persons could reach but one conclusion from all the evidence. *Swanson*, 118 Wn.2d at 518.

---

[2] Winspear initially contends that the trial court erred by granting Boeing's motion for summary judgment because the motion duplicated arguments Boeing made in its prior, unsuccessful summary judgment motion. However, the second motion is readily distinguishable from the first because the second included two entirely new bases for summary judgment (failure to state a discrimination claim or an implied contract claim) and offered a new theory for why no public policy violation occurred (that even if WAC 162-16-060 created a public policy protecting convicted criminals from arbitrary discharge, Boeing's discharge of Winspear was not arbitrary). While Boeing could have made the public policy argument in its first motion, nothing compelled it to do so. Hence, Winspear's contention had no merit. Further, because he does not argue on appeal that CR 11 sanctions should be imposed, we must conclude Winspear has abandoned that argument.

Under the common law, the "employment at will" doctrine permitted either the employer or the employee to terminate an employment relationship without liability. *Thompson,* 102 Wn.2d at 225. In *Thompson,* the Supreme Court modified the common law doctrine in three ways. First, the court adopted a contractual approach under which

the employer's right to terminate an at will employee can be contractually modified and, thus, qualified by statements contained in employee policy manuals or handbooks issued by employers to their employees. Under this approach the requisites of contract formation, offer, acceptance and consideration are necessary predicates to establishing that policies in an employment manual are part of the employees' original employment contract or part of the employment contract as modified by the parties. . . . We agree with . . . cases that [hold] an employee and employer can contractually obligate themselves concerning provisions found in an employee policy manual and thereby contractually modify the terminable at will relationship.

(Citations omitted.) 102 Wn.2d at 228-29.

Second, the court held that the common law rule could be modified by policies announced in employee handbooks even without the traditional contract elements:

Independent of [the above] contractual analysis, however, we hold that *employers may be obligated to act in accordance with policies as announced in handbooks issued to their employees.* When the employment relationship is not evidenced by a written contract and is indefinite in duration, the parties have entered into a contract whereby the employer is essentially obligated to only pay the employee for any work performed. In this contractual relationship, the employer exercises substantial control over both the working relationship and his employees by retaining independent control of the work relationship. Thus, the employer can define the work relationship. . . .

However, absent specific contractual agreement to the contrary, we conclude that *the employer's act in issuing an employee policy manual* can lead to obligations that govern the employment relationship. . . .

We are persuaded that the principal, though not exclusive, reason employers issue such manuals is to create an atmosphere of fair treatment and job security for their employees.

While an employer need not establish personnel policies or practices, where an employer chooses to establish such policies and practices and makes them known to its employees, the employment relationship is presumably enhanced. The

employer secures an orderly, cooperative and loyal work force, and the employee the peace of mind associated with job security and the conviction that he will be treated fairly. . . .

Therefore, we hold that if an employer, for whatever reason, creates an atmosphere of job security and fair treatment with promises *of specific treatment in specific situations* and an employee is induced thereby to remain on the job and not actively seek other employment, those promises are enforceable components of the employment relationship. We believe that by his or her unilateral objective manifestation of intent, the employer creates an expectation, and thus an obligation of treatment in accord with those *written promises.*

(Citations omitted. Some italics ours.) 102 Wn.2d at 229-30.

Finally, the court recognized an employee's cause of action in tort for wrongful discharge if the discharge "contravenes a clear mandate of public policy". 102 Wn.2d at 232. The court summarized its holding as follows:

An employment contract indefinite as to duration, is terminable at will by either the employee or employer. But such a contract is terminable by the employer only for cause if (1) there is an expressed or implied agreement to that effect or (2) the employee gives consideration in addition to the contemplated service. Moreover, promises of specific treatment in specific situations *found in an employee manual or handbook issued by an employer to his or her employees* may, in appropriate situations, obligate the employer to act in accord with those promises. Lastly, an employer can be liable in tort if he or she discharges an employee for a reason that contravenes a clear mandate of public policy.

(Citation omitted. Italics ours.) 102 Wn.2d at 233.

*Thompson*'s second modification of the common law — *i.e.,* the implied contract analysis — refers specifically to written employment policy manuals. The court never suggested that an oral promise by an employer would be sufficient to modify an otherwise at-will employment relationship under the common law rule. Winspear mistakenly relies on *Adler v. Ryder Truck Rental, Inc.,* 53 Wn. App. 33, 765 P.2d 910 (1988), *review denied,* 112 Wn.2d 1013 (1989), *overruled on other grounds by Burnside v. Simpson Paper Co.,* 123 Wn.2d 93, 94, 864 P.2d 937 (1994), to argue to the contrary.

In *Adler,* there was no written employment agreement. When Adler received a written warning from his supervisor

about his performance, the warning also specified the details of Ryder's progressive disciplinary system. 53 Wn. App. at 34. Ryder management also had advised Adler orally about the progressive disciplinary system. 53 Wn. App. at 35. Ryder subsequently fired Adler, and he sued for wrongful discharge. The trial court granted Ryder's motion for a directed verdict.

On appeal, Division Three relied on *Thompson* to reverse the trial court because it failed to determine whether Ryder specifically represented to Adler that discharge would be for cause only.[3] *Adler*, 53 Wn. App. at 37. In so holding, the court indicated it was "not limited to examination of the personnel manual" and cited *Brady v. Daily World*, 105 Wn.2d 770, 718 P.2d 785 (1986) to support that conclusion. *Adler*, 53 Wn. App. at 36.

However, *Brady* does not stand for the proposition that an employer's oral representations, in themselves, can obligate the employer to a course of action as written policies in an employee manual can. Brady was discharged for allegedly being "under the influence" on the job on several occasions. The employee manual stated under the section heading "Dismissal for Cause" that intoxication would be a sufficient ground for dismissal. 105 Wn.2d at 772. Brady's affidavit alleged, however, that his employer had orally assured him he could be fired only for cause. The trial court granted the employer's motion for summary judgment. 105 Wn.2d at 771.

On appeal, the Supreme Court reversed and remanded the case for trial on the issue of whether, under *Thompson*, the parties had an express or implied agreement that discharge would be only for cause. The court concluded that factual issues remained of whether policies in the personnel handbook amounted to promises of specific treatment in specific situations and, if so, whether Brady had justifiably relied on that promise. 105 Wn.2d at 775. The court also held that there

---

[3]The *Adler* court initially noted that Ryder's personnel manual did not create any specific expectations regarding employee termination because the manual was written only for supervisory personnel, not general employees. 53 Wn. App. at 36. The Supreme Court has since reversed *Adler* on that point, along with *Hatfield v. Columbia Fed. Sav. Bank*, 57 Wn. App. 876, 790 P.2d 1258 (1990). *See Burnside*, 123 Wn.2d at 106.

were several other factual issues about whether Brady had been intoxicated. The court concluded that "[t]hose matters, *coupled with* [Brady]'s testimony that he was told that he was doing a good job and would be employed so long as he so performed, raise issues of fact as to conditions of employment and cause for termination." (Italics ours.) *Brady*, 105 Wn.2d at 776. That holding does not support Winspear's contention that an oral assurance of employment, without written policies or practices, can form the basis for an implied employment agreement that overrides the common law rules of at-will employment.

Likewise, *Swanson v. Liquid Air Corp.*, 118 Wn.2d 512, 826 P.2d 664 (1992) does not support Winspear's position. *Swanson* involved a written employee benefits manual with a disclaimer that was intended to keep all employees "at will" regardless of any agreement or company promise to the contrary, with some narrow exceptions. In addition, a "Memorandum of Working Conditions" was issued to 13 nonunionized truck drivers working for Liquid Air. That memorandum included a provision that certain acts by employees could result in immediate dismissal without notice, but for all other misconduct at least one warning would be given. 118 Wn.2d at 516. Fighting was not one of the identified acts that would result in immediate discharge. High-level corporate officials held meetings with the drivers to explain the memorandum, and they stated that " 'the company would abide by the rules in the agreement and that no union representation would be necessary.' " 118 Wn.2d at 517. They also distributed a drivers handbook which stated that fighting was prohibited. 118 Wn.2d at 516.

Swanson, one of the drivers, received a copy of the employee benefits manual, the memorandum, and the handbook. He never read the disclaimer in the benefits manual. 118 Wn.2d at 515. After the meetings with the corporate officials, he understood that his employment agreement was governed by the memorandum. 118 Wn.2d at 516.

Liquid Air subsequently discharged Swanson for fighting with another employee. 118 Wn.2d at 517. Swanson sued the company for wrongful discharge, claiming that under the

memorandum provisions he was entitled to at least one warning before discharge. The company argued that the disclaimer in the benefits manual was effective as a matter of law to ensure Swanson remained an at-will employee. The trial court granted the company's motion for summary judgment. Division Two of the Court of Appeals reversed, holding that the memorandum promised specific treatment in specific situations under *Thompson*, and whether Swanson justifiably relied on the promises in the memorandum was a question of fact. 118 Wn.2d at 518.

The Supreme Court granted the company's motion for discretionary review and identified the issues as follows:

> (1) whether there are material issues of fact as to whether the Memorandum of Working Conditions modified the previously existing employment relationship; (2) whether the disclaimer is effective as a matter of law thus preserving a terminable at will employment relationship; (3) whether, if the disclaimer is not effective as a matter of law, the statement in the drivers handbook that fighting is prohibited constitutes the warning required by the work rights provision in the Memorandum of Working Conditions; and (4) whether immediate discharge for fighting on the premises was proper regardless of any express provisions to the contrary.

118 Wn.2d at 519.

The court held that whether the memorandum modified the employment relationship involved material issues of fact precluding summary judgment; a disclaimer must be effectively communicated to an employee to be enforceable, and there were material issues of fact in that regard; an employer's inconsistent representations and conduct may negate or override a disclaimer, and material issues of fact remained as to Liquid Air's representations; and because the drivers handbook did not contain the warning required by the memorandum, the fighting incident was not cause for immediate dismissal regardless of any express provisions to the contrary. 118 Wn.2d at 519-20.

In its analysis, the Supreme Court adopted the view that an employer's inconsistent representations, including oral assurances, "may negate the effect of *written* disclaimers which are intended to absolve employers from liability for

policies presented *in the employer's literature.'*" (Italics ours.) *Swanson*, 118 Wn.2d at 533 (quoting *Wilson v. General Motors Corp.*, 183 Mich. App. 21, 32, 454 N.W.2d 405 (1990)). Thus, an employer's oral promises may negate the effects of a written disclaimer regarding at-will employment.

That holding, however, is distinctly different from Winspear's contention that an employer's oral promise of specific treatment in specific situations can create an enforceable employment agreement that equals the documented and disseminated employment policies which *Thompson v. St. Regis Paper Co.*, 102 Wn.2d 219, 685 P.2d 1081 (1984) addressed. *Thompson*'s key concern was that employers could take unfair advantage of employees under the common law rules of at-will employment. Employees often rely on their employers' written policies and representations and, because of that reliance, they continue working and advancing their employers' interests. *Thompson* recognized that it would be unjust for employers to use the common law to legitimize reneging on their written representations to employees after benefiting from the employees' collective reliance on those representations. 102 Wn.2d at 230. Winspear's case bears no resemblance to the problem *Thompson* intended to remedy, and *Swanson* does not purport to extend *Thompson* to include the circumstances surrounding Winspear's discharge.

■ Thus, assuming Geidt made the statements Winspear alleges he made, those statements as a matter of law are not the sort of employer action on which *Thompson* based its analysis. *Thompson* explicitly based its implied contract exception to the common law on written policies and procedures in employee manuals and the "atmosphere of fair treatment and job security" which those written policies create. *Thompson*, 102 Wn.2d at 229. An oral promise by a representative of a company to a single employee may negate the effect of a written disclaimer in an employer's literature (*see Swanson*, 118 Wn.2d at 533, 534), but it does not serve the same function as a written policy manual disseminated to all employees. Further, such an oral promise might bind the company under an express contract analysis, given the proper

consideration, but it cannot form an implied employment contract under *Thompson*'s second exception to the common law rule.[4]

The court in *Lawson v. Boeing Co.*, 58 Wn. App. 261, 792 P.2d 545 (1990), *review denied*, 116 Wn.2d 1021 (1991) reached a similar conclusion. Lawson alleged that Boeing promised he was guaranteed his job as long as he maintained his supervisory position. After considering *Thompson*, the court concluded:

> Lawson has not presented evidence of any written statements of policy that could be interpreted as promises of specific treatment. He has merely alleged that Boeing made repeated oral promises that so long as job performance met a certain level he would retain his supervisory position. These statements are not sufficient to create an issue of material fact as to the existence of an enforceable promise of continued employment in a specific job. He remained an "at will" employee. *Oral assurances of continued employment and an employee's forgoing of other employment opportunities do not create an implied employment contract.* Nor was there any showing of actual or apparent authority by the persons making the statements to bind Boeing to an employment contract.

(Footnote omitted. Italics ours.) *Lawson*, 58 Wn. App. at 264-65 (citing *Roberts v. ARCO*, 88 Wn.2d 887, 894-96, 568 P.2d 764 (1977)).

In sum, we conclude that the parties did not have an implied contract under *Thompson*, and the trial court did not err by granting Boeing's motion for summary judgment.[5]

---

[4]It is not clear from Winspear's Briefs if he is also arguing under traditional contract theory that he supplied any necessary consideration to support an implied employment agreement with Boeing through Geidt. If he is, that argument must fail because his decision to accept the plea bargain rather than go to trial was neither a benefit to Boeing nor a detriment to Winspear and, thus, falls short of consideration. *See, e.g., Emberson v. Hartley*, 52 Wn. App. 597, 601, 762 P.2d 364 (1988) (" 'Consideration may consist of an act, a forbearance, the creation, modification or destruction of a legal relationship, or a return promise given in exchange.' ") (quoting *Huberdeau v. Desmarais*, 79 Wn.2d 432, 439, 486 P.2d 1074 (1971)), *review denied*, 112 Wn.2d 1007 (1989).

[5]Given our holding that there was no implied contract under *Thompson*, we need not address Winspear's arguments about the trial court's conclusions on the issue of reliance.

## II

### PUBLIC POLICY

Winspear also argues that Boeing violated public policy by violating WAC 162-16-060. That argument must fail in light of *Gugin v. Sonico, Inc.*, 68 Wn. App. 826, 846 P.2d 571 (1993). The WAC provision made it an unfair practice for an employer to discriminate against someone convicted of a crime. In *Gugin*, the court held that by promulgating WAC 162-16-060, the Human Rights Commission exceeded its legislative grant of authority because it created a new protected class — convicted criminals — which amounted to a legislative act. The court consequently declared WAC 162-16-060 invalid.[6] *Gugin*, 68 Wn. App. at 831. Because Winspear does not give any basis other than WAC 162-16-060 for his public policy argument, there is no need to address his arguments about pretext or Boeing's obligation to transfer him to another position which were rooted in his public policy and RCW 49.60 discrimination claims.

The trial court's order granting summary judgment to Boeing is affirmed.

COLEMAN and AGID, JJ., concur.

Review denied at 126 Wn.2d 1006 (1995).

---

[6]We note that there was no petition for review in *Gugin*, and the mandate was entered April 5, 1993. We also note the theory of promissory estoppel was not argued by Winspear.