[Nos. 17112-1-II; 17639-4-II. Division Two. January 16, 1996.]

JOHN HERRING, *Respondent*, v. THE DEPARTMENT OF
SOCIAL AND HEALTH SERVICES, ET AL., *Appellants*.

*Christine O. Gregoire, Attorney General,* and *Lisa L. Sutton, Assistant,* for appellants.

*John C. Cain* and *Leslie E. Tolzin,* for respondent.

HOUGHTON, J. — After a jury trial on his claims for wrongful discharge from the Department of Social and Health Services (DSHS),[1] John Herring was awarded damages. DSHS appeals the verdict in favor of Herring, contending that the trial court erred: in denying its motion for summary judgment verdict; in certain evidentiary rulings; in denying its motion for a directed verdict; in instructing the jury; in denying its posttrial motions; and in awarding attorney fees. Herring cross-appeals, arguing the trial court erred in instructing the jury. We affirm.

## FACTS

DSHS hired John Herring, who holds a master's degree in social work, as a Social Security Insurance (SSI) "facilitator" on December 4, 1989. Herring was hired and continued to work as a probationary employee during his tenure at DSHS. On November 28, 1990, DSHS notified Herring that it was terminating his employment because Herring's supervisor found his work unsatisfactory. DSHS

---

[1]The defendants were the Department of Social and Health Service, State of Washington, and Cheryl Turk, who are identified collectively as DSHS.

maintains that Herring's blindness prevented him from performing the job, even with reasonable accommodation.

The SSI facilitator position was established in 1987 to assist Washington state residents receiving General Assistance Unemployable benefits (GAU) to successfully apply for SSI benefits. The successful applicant received greater benefits and the state was paid recoupment costs under the GAU program. In an attempt to speed up the application process statewide, DSHS relied on facilitators to help reduce the large backlog of cases.

Herring expedited the processing of applications for SSI benefits. He evaluated applicants seeking federal disability benefits by assessing and documenting the applicant's disability and its effects. A facilitator also gathered information and prepared SSI applications. Once completed, the applications were sent to DSHS's Office of Disability Insurance (ODI). Due to the nature of the benefits — supplemental medical and income — speed in processing the applications and obtaining approval was critical.

An ODI adjudicator then reviewed the applications for compliance with federal guidelines and made recommendations to the Federal Social Security Office to either accept or reject the application. Only the facilitators had personal contact with applicants.

DSHS knew when it hired Herring that he had a visual impairment called retinitis pigmentosa, a progressive disease that rendered Herring legally blind. Herring received SSI benefits and was familiar with the application process. He told DSHS that he would be able to do the job despite his disability. Herring said that he could use his own eyesight assistance viewer to assist him in the reading requirements of the job. Apparently, the viewer magnifies print up to 60 times its original size.

DSHS also made some accommodations for Herring by converting the facilitator's training manual on to audio cassette tapes and purchased a telephone headset for Herring so that he could use his hands when he was on the telephone. However, Herring testified that DSHS did not

have the tapes converted until after he called the Office of Equal Opportunity and complained.

As part of the job, Herring was subject to frequent evaluations by his supervisor, Cheryl Turk. The possible types of evaluations/reviews were: annual review, trial service review, probationary review and other special review (underlined portion typed into DSHS form).

The standard employee performance evaluation rated Herring in five categories: accomplishment of job requirements; job knowledge and competence; job reliability; personal relations; and communication skills. Within the five categories, the employee's performance was judged to be one of the following: far exceeds normal requirements; exceeds normal requirements; meets normal requirements; meets minimum requirements; or fails to meet minimum requirements. Within the five categories the evaluator could comment on the employee's performance. Herring was evaluated on March 4, 1990; April 4, 1990; May 4, 1990; and, June 21, 1990.[2]

In the March 4, 1990 special review evaluation, Herring met the minimum requirements in four areas and normal requirements in the category of job knowledge and competence. The April 4, 1990 evaluation, also a special review, generally gave Herring the same marks. In the May 4, 1990 evaluation, Herring failed to meet the minimum requirements in four areas and met the minimum in job knowledge and competence. This evaluation provided more extensive individual assessments. After this evaluation, Turk transferred 20 unopened cases to other workers.

The fourth evaluation, covering the period between June 22, 1990 and October 16, 1990, made note of many deficiencies in Herring's performance. Herring failed to meet the

---

[2]The standard form evaluation consists of three pages, with the last page titled work plan for the future, and has space for acknowledgement of the evaluation by the evaluating supervisor, the reviewer's signature and the employee's signature. The last page for the March, April and May evaluation was signed by the reviewer and supervisor on August 2, 1990, and August 13, 1990, by Herring. The reason for the delay is based upon Herring's objection to the language used in the evaluations. This objection was later remedied as explained below.

minimum requirements in four areas and met the minimum requirements in the communication skills category. Turk wrote that Herring failed to demonstrate he could perform the work and that she could not recommend him for permanent placement. Linda Evans, who signed as reviewer, recommended a probationary separation. Herring acknowledged this evaluation on October 29, 1990, and offered a response.

Herring believed this last evaluation was inaccurate and contained numerous misrepresentations. He stated that he filed two employee grievances during this evaluation period, requesting that an objective evaluation be carried out by someone other than Turk, whom Herring maintained could not be objective because she was insecure as a new supervisor. Herring said that Turk created an intolerable and divisive working environment. He claimed that she intentionally withheld information about cases, thus rendering him unable to timely complete his work. He further claimed that he met all the requirements, with the exception of those cases where material was unavailable because of Turk's actions. Herring stated that Turk was quibbling over minor typographical errors. In sum, Herring claimed that he and Turk had a severe personality clash and that Turk found fault in everything that Herring did.

According to testimony at trial, problems between Herring and Turk began shortly after the second evaluation. In late April, Turk conducted an "audit" of the materials in Herring's desk when he was absent. On May 10, 1990, Turk began a 100 percent audit of Herring's work. Herring claims that no other facilitator has been subjected to such supervision before or since.

In June, Turk filed an employee personal conduct report (PCR) against Herring for leaving the building without telling her. The PCR was later discarded because there was no policy requiring a facilitator to receive his supervisor's permission before leaving the building. Linda Evans, Turk's supervisor, told Turk to destroy the PCR.

Herring disagreed with his first three performance evaluations and refused to sign them because of objectionable language about his disability. Herring disputed the June 22 evaluation because he disagreed with Turk's characterization of his ability to complete cases and claimed that he completed more cases than she represented. He said that many cases were reconsiderations and were not counted by Turk. Herring then filed his first grievance.

During a grievance hearing on July 23, 1990, the union shop steward assisted Herring in his dispute. The shop steward assessed the evaluations and also found the language used to be inflammatory, and told Evans that if the use of the language remained, the shop steward would advise Herring to complain to the Human Rights Commission.

The objectionable language was eventually stricken, and in August Herring signed the reviews under protest. Herring also wrote a reply to the August evaluation. Turk testified that usually these responses are attached to the evaluation, but in Herring's case they were not attached to the supervisor's evaluation. Turk did not explain why she did not attach them.

In August, Herring filed his second grievance against Turk. That same day, pursuant to RCW 41.06.176 and WAC 356-30-300(6), Turk gave Herring a corrective action plan detailing how he could qualify for permanent employment. The corrective action plan required that Herring process 20 to 22 initial applications in addition to any reconsiderations and appeals.

In Herring's August grievance, he stated that he wanted to take his viewer home, but had not been allowed to do so because DSHS would not purchase a viewer for him. Herring requested a viewer in a July memorandum to Turk. She replied on August 15, 1990, stating that DSHS could not afford to obtain one for him. The hearing examiner on the grievance responded that Herring had volunteered to bring in and use his personal viewer, but directed DSHS

to look into purchasing a viewer so that Herring could take his viewer home. The examiner gave DSHS 30 days to provide a viewer. By the October evaluation date, DSHS decided to terminate Herring, negating the need to buy a viewer.

Herring filed another grievance on September 28, 1990, in response to the corrective action plan. He claimed that there were many inaccuracies in the plan. That same day, Turk called the ODI to check Herring's progress with his cases. Turk testified that she was told that Herring missed several deadlines for reconsideration. She wrote Herring a memorandum on October 2, 1990, and included these allegations. Herring replied that Turk had incorrect information. The matter was then dropped.

In the October 19, 1990 evaluation, Turk alleged that Herring failed to meet the requirements set forth in the corrective action plan. Turk referred to the October 2, 1990 memorandum and stated that Herring missed several deadlines for reconsideration. Herring disputed this notation. During cross-examination of Turk at trial, it was revealed that one of the files the ODI allegedly identified as being mishandled had in fact been given immediate attention by Herring and fully processed.

Turk testified that Herring completed 18 cases in September, 20 cases in October, and "20-some" cases in November. Turk also claimed that Herring exhibited insubordinate behavior by refusing to comply with her orders. Turk testified that she told Herring to come to her if he needed help, but he instead sought assistance from two of his co-workers.[3]

On November 28, 1990, the DSHS Regional Administrator, Liz Dunbar, sent Herring a letter terminating his employment for failing to meet the minimum require-

---

[3]According to Herring, he asked two of his co-workers to write in the start and end dates on some forms that he processed. Herring claims that he had difficulty distinguishing the colors, yellow and red, and the forms were color coded, thus necessitating the need for assistance. In return, he helped the other employees.

ments in all categories.[4] Herring then filed a lawsuit alleging harassment, discrimination, and retaliatory and wrongful discharge from employment. DSHS countered that Herring was not physically capable of performing the job.

DSHS moved for summary judgment of dismissal on March 19, 1992, contending Herring's discharge was proper because he was unable to perform essential job functions, and as a probationary employee, Herring could be dismissed without cause. DSHS further claimed that DSHS demonstrated that there was no discrimination or retaliation in the termination. Five months later, on September 8, 1995, the trial court denied the motion.

A jury trial was held and a number of witnesses testified. Herring elicited testimony from various witnesses, including Turk, that he could handle the volume demand in an effective and professional manner. Other witnesses testified that Herring carried out his job effectively. Several of Herring's co-workers testified that they found Herring's work satisfactory. One co-worker found Herring to be "pleasant" and "inspirational," controverting Turk's claim that the office suffered low morale as a result of Herring's inadequate work. Some of the ODI adjudicators testified as to Herring's work product.

Herring sought work unsuccessfully in the social work field after being fired. Because he had been terminated from his job with the State, his name was removed from the State's register of social workers. This was done at the request of DSHS by the Department of Personnel. Herring requested a hearing on the decision to remove his name. The decision was upheld because Herring's dismissal was in accord with WAC 356-22-070(2) (Applications—

---

[4]Among the problems with Herring's performance cited were trouble staying organized; difficulties prioritizing caseload and failure to handle volume demands; trouble completing forms and status reports; and problems reexamining clients' eligibility for services. He also failed to properly use the forms and status reports system. DSHS required Herring to use these forms, but did not find the information derived from those forms reliable.

Disqualifications). During that period, three social worker jobs were filled for which Herring was otherwise qualified.

Sometime later, Herring's name was placed on the State's list, but he was still unsuccessful in finding a position. Herring eventually sent out 148 resumes, but never found employment.

At trial, Herring and his mother testified about Herring's response to losing his job and his inability to find another one. His mother referred to his reaction as similar to the decline seen in someone who is terminally ill.

Herring thereafter sought advice from a vocational rehabilitation expert, Dean Cooney. Cooney concluded that Herring most likely would not find another job in the field of social work. Cooney said that Herring's termination from state employment was a "big hinderance in [his] pursuing a career in social work." Moreover, Cooney said that it would be difficult for Herring to find a job after being unemployed for two years. Cooney thought that Herring would have to be retrained.

Herring testified that he considered becoming a lawyer. Jack Foley, a consulting actuary, projected that if Herring became a lawyer, his economic loss would be about $75,000 over his lifetime. Foley also testified that if Herring was not employed again, his economic loss would be $630,000. DSHS's expert calculated that Herring would suffer no earning loss if he became a lawyer.

Dr. Gary L. Forrest, an ophthalmologist called by DSHS, testified that Herring's disability was so severe that he could not perform the essential functions of his job. Dr. Forrest opined, however, that this was only a medical conclusion and that he had not personally evaluated Herring's work. According to Dr. Forrest, Herring became legally blind at age 19, and his eyesight continued to deteriorate thereafter. Dr. Forrest concluded that Herring could read print one-quarter inch in height slowly and with difficulty. Dr. Forrest diagnosed that Herring had no peripheral vision, only three percent vision in his left eye, and no vision in his right eye. Herring did not dispute this testimony, nor did he put on any rebuttal evidence.

DSHS's expert, Carl Gann, a vocational rehabilitation counselor, testified that Herring did not have the reading speed necessary to keep up with the job demands, even with a viewer. Gann said, however, that he was in no position to judge the quality of Herring's work and thus had not done so. Gann testified that Herring should never have been placed in such a labor intensive job and that Herring was better suited for other types of social work, such as counseling.

After the close of Herring's and also its own case, DSHS moved for a directed verdict, claiming that Herring had not proved he was qualified to perform the social worker job. The trial court denied both motions.

After a six-week trial, the jury found, by special verdict, discrimination, retaliation, and wrongful termination. The jury awarded Herring $55,000 for past economic damages, $500,000 for future economic damages and $550,000 for noneconomic damages. The trial court awarded attorney fees of $267,862.50 and costs of $18,510.24. The trial court denied motions for judgment notwithstanding the verdict, new trial, remittitur, and reconsideration of the attorney fee award. The trial court awarded Herring additional attorney fees of $32,068.75 and costs of $205.40 for posttrial motions. Both DSHS and Herring appealed.

ANALYSIS

I

DSHS's APPEAL

A. Motions for Summary Judgment and
Directed Verdict

■ DSHS contends that the trial court erred in denying its motions for directed verdict. DSHS failed to present any argument on this assignment of error, and we decline to review it. Assignments of error not supported by legal argument are not considered on appeal. *Pannell v. Food Servs. of Am.*, 61 Wn. App. 418, 436, 810 P.2d 952, *amended*, 815 P.2d 812 (1991), *review denied*, 118 Wn.2d 1008 (1992).

■■ DSHS next contends that the trial court erred in denying its motion for summary judgment. DSHS failed to present any argument on the issue until its reply brief, and "[a]n issue raised and argued for the first time in a reply brief is too late to warrant consideration." *Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 809, 828 P.2d 549 (1992). Moreover, the matter went to trial, and a ruling denying summary judgment "based upon the presence of material disputed facts" is not reviewable after trial on the merits. *See Johnson v. Rothstein*, 52 Wn. App. 303, 306, 759 P.2d 471 (1988).

## B. Posttrial Motions

DSHS next contends that the trial court erred in denying its posttrial motions for judgment notwithstanding the verdict, new trial and remittitur.[5] DSHS asserts that the jury's verdict and the special verdict contained inconsistent findings.

In its opening brief, DSHS argues that:

> [t]he jury found in its special verdict that notwithstanding his blindness and with his own viewer plaintiff was "otherwise qualified" to perform the State social worker job. Yet the jury found damages for the remainder of plaintiff's life because he could never work again. These two findings are totally inconsistent. The jury's award of $500,000 for lifetime economic damages is inherently inconsistent with its finding that plaintiff was qualified to do social work and that his disability did not prevent him from doing so.

Also, DSHS claims that there was insufficient evidence to support the verdict and that the evidence demonstrated Herring's ability to work in the future, not his inability.[6]

---

[5]Although DSHS's assignments of error are less than clear and some of its argument conclusory, we are nonetheless able to review the contentions.

[6]Intertwined in DSHS's argument on sufficiency of the evidence is its contention that the trial court erred in certain evidentiary rulings, leading to the introduction of improper evidence. These evidentiary arguments are discussed below.

DSHS misconstrues the jury's answers to special interrogatories. The jury did not find that Herring could never work again. Nor did the jury award damages for the remainder of Herring's life. Rather, the jury found:

QUESTION No. 1: Was plaintiff John Herring with his own viewer qualified, without reasonable accommodations provided by the State of Washington, to perform the essential functions of a Supplemental Security Income Facilitator at the Department of Social and Health Services?

ANSWER: 12 Yes. 0 No's

QUESTION No. 2: Was John Herring wrongfully terminated from his position because of his handicap?

ANSWER: 12 Yes. 0 No's

QUESTION No. 3: Did the defendants Department of Social and Health Services, State of Washington, and/or Cheryl Turk fail to provide plaintiff with reasonable accommodation during his employment?

ANSWER: 12 Yes. 0 No's

QUESTION No. 4: Do you find that the Department of Social and Health Services and/or Cheryl Turk retaliated against John Herring?

ANSWER: 12 Yes. 0 No's

. . . .

QUESTION No. 6: If you answered "Yes" to either Questions 2, 3 or 4, what is the amount of plaintiff's damages which were proximately caused by the defendant's discriminatory or retaliatory acts against the plaintiff?

$ 55,000 Past Economic (earnings lost to date)

$500,000 Future Economic (future earnings)

$550,000 Non-economic (mental distress)

The jury's role is to weigh the evidence and decide issues of fact. *State v. Henderson*, 26 Wn. App. 187, 192, 611 P.2d 1365, *review denied*, 94 Wn.2d 1008 (1980). An

appellate court will overturn a jury verdict only if it is "clearly unsupported by substantial evidence." *Burnside v. Simpson Paper Co.*, 123 Wn.2d 93, 107-08, 864 P.2d. 937 (1994); *Adcox v. Children's Orthopedic Hosp.*, 123 Wn.2d 15, 35, 864 P.2d 921 (1993). "The requirement of substantial evidence necessitates that the evidence be such that it would convince 'an unprejudiced, thinking mind'. . . . The inquiry on appeal is limited to whether the evidence presented was sufficient to sustain the jury's verdict." *Industrial Indem. Co. v. Kallevig*, 114 Wn.2d 907, 916, 792 P.2d 520 (1990) (citation omitted).[7]

■ In the event the special verdict is inconsistent, a court will harmonize the verdict to the extent possible. *State v. Peerson*, 62 Wn. App. 755, 765, 816 P.2d 43 (1991), *review denied*, 118 Wn.2d 1012 (1992). A new trial must be ordered if the special verdict contains contradictory answers to the interrogatories, making the jury's resolution of the ultimate issue impossible to determine. *Blue Chelan, Inc. v. Department of Labor & Indus.*, 101 Wn.2d 512, 515, 681 P.2d 233 (1984).

Our Supreme Court has held that in reviewing a jury's verdict:

> . . . This court will not willingly assume that the jury did not fairly and objectively consider the evidence and the contentions of the parties relative to the issues before it. *Phelps v. Wescott*, 68 Wn.2d 11, 410 P.2d 611 (1966). The inferences to be drawn from the evidence are for the jury and not for this court. *The credibility of witnesses and the weight to be given to the evidence are matters within the province of the jury and even if convinced that a wrong verdict has been rendered, the reviewing court will not substitute its judgment for that of the jury, so long as there was evidence which, if*

---

[7]Generally, review of a jury verdict involves a three-part analysis: is it outside the range of substantial evidence in the record; does it shock the conscience of the court; or does it appear to have been arrived at as the result of passion or prejudice? *Washburn v. Beatt Equip. Co.*, 120 Wn.2d 246, 267-68, 840 P.2d 860 (1992). DSHS only sets forth the conclusory argument that the award is outside the range of substantial evidence, thus we do not analyze the other two questions.

*believed, would support the verdict rendered. Burke v. Pepsi-Cola Bottling Co.*, 64 Wn.2d 244, 391 P.2d 194 (1964).

*Burnside*, 123 Wn.2d at 108 (quoting *State v. O'Connell*, 83 Wn.2d 797, 839, 523 P.2d 872 (1974)).

Herring was trained as a social worker and hired to work as one by the State through DSHS. After Herring was terminated, DSHS requested that Herring's name be removed from the hiring register. Additionally, a memorandum dated November 14, 1991, was sent to the personnel services supervisor regarding Herring, which became part of his personnel file. The memorandum requested that Herring's name be removed from the three Social Worker 2 referrals registers immediately, based upon his discharge a year earlier. The jury heard testimony about Herring's repeated and unavailing attempts to seek gainful employment as a social worker. The situation was unchanged even after the State placed Herring's name back on the registers.

Cooney, a vocational rehabilitation counselor, testified about the obstacles faced by Herring in his job search. Cooney said that he did not think Herring would be able to find work in the field of social work. John Robertson, a State Personnel Office employee, testified that Herring's name was returned to the register in June 1992, but testified that Herring's name could once again be removed from the register at the request of a former employer such as DSHS.

The jury heard testimony from Herring's actuarial expert that if Herring never worked again, his economic loss would be "around $630,000," whereas if he were retrained as a lawyer, he would lose approximately $75,000 over his lifetime. Foley provided extensive evidence about how he arrived at the figures, considering factors such as Herring's age, benefits available (retirement, medical, dental); costs of retraining; and Herring's employability. Such a conclusion is not inconsistent. DSHS's economic expert, David Knowles, Ph.D., stated that if Her-

ring was retrained as an attorney, he would make $350,000 to $550,000 more over his lifetime than he would as a social worker.

■■ DSHS asserts that Herring was awarded damages for lifetime wage loss. However, the jury considered all the evidence and awarded Herring $500,000 for future economic losses, an amount less than what the actuary testified would be a lifetime economic loss. Here, there is substantial evidence from which the jury could conclude that Herring would suffer a significant wage loss, but for less than his entire life. We will not overturn a jury's verdict on damages if it is within the range of the evidence. *Alger v. Mukilteo,* 107 Wn.2d 541, 551, 730 P.2d 1333 (1987). The award here was within the testified range. The evidence supports the verdict and damage award for future economic loss.[8]

## C. Evidentiary Rulings

### 1. Exclusion of Evidence

DSHS contends that the award for future economic loss is not supported by substantial evidence because the trial court erred by admitting contradictory and speculative expert opinion testimony that Herring could never work again. DSHS further contends the testimony provided an incorrect measure of future damages. DSHS asserts that it moved to strike the "speculative" testimony of the actuary, Jack Foley, but that the trial court denied the motion as untimely. The trial court did not rule that the motion was untimely, but rather denied it after hearing counsel's argument that there was no foundation for the testimony. The trial court just denied the motion without giving a reason.

■■■ Trial court rulings excluding evidence are

---

[8]DSHS does not specifically assign error to the trial court's denial of its motion for judgment notwithstanding the verdict. Nor does it set forth any argument that the trial court erred in denying its motion for remittitur, other than a conclusory statement. However, our discussion of the sufficiency of the evidence addresses these concerns.

reviewed under an abuse of discretion standard. *Burnside*, 123 Wn.2d at 107. The admissibility of expert testimony is at the discretion of the trial court. *Roberts v. ARCO*, 88 Wn.2d 887, 898, 568 P.2d 764 (1977). The trial court will admit testimony if it will assist the jury in understanding uncommon matters. *Roberts*, 88 Wn.2d at 898.

DSHS relies on *Roberts*, but misstates the facts of the case. Roberts had been employed by Arco for seven years prior to his termination. He alleged that he was fired due to his age. He attempted to base his claim of lifetime damages upon what he thought was a guarantee for lifetime employment. The trial court disagreed and held that the conclusions by his expert were completely speculative and denied the testimony. Such is not the case here.

Our review of the record discloses that Herring's expert provided an extensive foundation as the basis of his opinion. The jury heard from Herring's vocational counselor that Herring would probably never be able to work again in the social work field. The actuary then testified about losses if Herring retrained and if he never worked again. He also testified that Herring was currently losing about $30,000 a year. The trial court admitted the testimony to aid the jury in its determination of damages, should it find in favor of Herring. The trial court did not abuse its discretion.

DSHS further contends that the appropriate measure of damages for future earnings is the time reasonably necessary for Herring to find an equivalent job. *Burnside v. Simpson Paper Co.*, 66 Wn. App. 510, 529-30, 832 P.2d 537 (1992), *aff'd*, 123 Wn.2d 93, 864 P.2d 937 (1994). In *Burnside*, the court noted that the burden is on the employer to prove that the employee failed to mitigate damages in an age discrimination suit. *Burnside*, 66 Wn. App. at 529. In order to succeed, DSHS is required to show that there were suitable positions available and that Herring "failed to use reasonable care and diligence in seeking them." *Burnside*, 66 Wn. App. at 529. DSHS has not met this burden. To the contrary, evidence was presented

that Herring tried to obtain work in the social work field. Herring submitted over 140 applications for employment. It was only after his lawsuit was filed that Herring's name was placed back on the register. The trial court did not abuse its discretion in admitting the actuary's testimony.

DSHS next contends that the trial court abused its discretion by excluding evidence that Herring was offered a social worker job by the State. DSHS asserts that the trial court excluded the evidence on grounds that it was inadmissible under ER 408 because it was an offer of settlement. However, our review of the record discloses that the trial court concluded there was an inadequate foundation for admission of the evidence.

DSHS claims that it offered an unconditional social worker 2 position to Herring during an attempted mediation of the lawsuit. Apparently DSHS attempted to introduce a letter dated April 12, 1991, and identified as exhibit 110. The letter described a possible lawsuit, but is not addressed to Herring, and there is no indication that Herring ever received a copy of the letter. The trial court believed that the letter contained an inadmissible offer of compromise, but allowed DSHS counsel to lay a foundation for its admission out of the jury's presence. ·

DSHS counsel attempted to lay a foundation through Herring, but failed to do so. Counsel claimed that at the mediation DSHS made an offer of unconditional employment. Herring recalled discussions about his evaluations and a new viewer, but also recalled that he was the one that brought up another social worker job. The trial court then determined that any further voir dire of Herring regarding the proposed document would be a waste of time, and ruled against its admission of the letter during Herring's testimony.

As further support of its efforts to introduce the employment offer, DSHS cites to an offer of proof regarding Liz Dunbar's testimony, but fails to link the testimony to the offer of employment. Herring contends that DSHS is barred from appealing this exclusion of evidence because it never offered the letter into evidence. ER 103, RAP 2.5.

Our review of the record discloses that exhibit 110 was never offered into evidence. DSHS was given an opportunity to lay a proper foundation with Herring and another witness, but it failed to do so. Therefore, the trial court did not err in excluding the evidence.

2. Admission of Evidence

DSHS next contends that the trial court erred in allowing testimony from nonsupervisory personnel. DSHS objected to certain witnesses testifying about Herring's work performance and the introduction of letters from several co-workers stating that Herring was qualified to perform his job.[9] DSHS further asserts that none of the people providing testimony had any personal knowledge of Herring's work product, especially in a supervisory role.[10] DSHS argues that the evidence is inadmissible under ER 602.

The admission of evidence is within the trial court's discretion and will not be overturned absent an abuse of discretion. Discretion is abused when based on untenable grounds or in a manifestly unreasonable manner. *Burnside*, 123 Wn.2d at 107. Under ER 602, "testimony should be excluded only if, as a matter of law, no trier of fact could reasonably find that the witness had firsthand knowledge." *State v. Vaughn*, 101 Wn.2d 604, 611-12, 682 P.2d 878 (1984) (citing 5 KARL TEGLAND, WASH. PRAC. § 219 (2d ed. 1982)).

DSHS relies on *Grimwood v. University of Puget Sound, Inc.*, 110 Wn.2d 355, 360-61, 753 P.2d 517 (1988). However, *Grimwood* is not dispositive of the issue. *Grimwood* dealt with sufficiency of the evidence, not admissibility.

Here, Herring offered testimony from Sheila Davidson,

---

[9]DSHS objected to testimony offered by Sheila Davidson because she worked in a different office as a supervisor to adjudicators. DSHS made a general objection to exclude testimony of Pat Skrinar and similar co-workers. There is no record that DSHS renewed its objection to each of these witnesses as they were called individually.

[10]DSHS objected to testimony regarding Herring's work offered by Sheila Davidson, Leslie Carlington, and Patricia Skrinar.

who testified that in her capacity as Disability Adjudicator Supervisor at the ODI, she had an opportunity to meet and talk with Herring. She further testified that her office receives completed SSI applications and that the ones that Herring worked on were always thorough and complete. She provided a foundation for her knowledge and assessment of Herring's work. The trial court allowed the testimony of Davidson to the extent it was offered to determine "whether or not the applications that were received from Mr. Herring were satisfactory" and did not abuse its discretion in doing so.

Testimony was also offered by Patricia Skrinar, an attorney working primarily in the SSI benefits area. She testified that Herring's work as a facilitator assisted her in pursuing claims. The trial court found that because the primary issue was whether Herring can do his job, "testimony of people who worked — interworked with him" — would be relevant. The trial court noted the testimony was reliable because the individuals were "dependent" upon Herring for information. Allowing the testimony for these reasons is not unreasonable, nor rested upon untenable grounds.

The witnesses were permitted to testify as to their personal relevant knowledge. Indeed, DSHS does not point to any place in the record where these witnesses were testifying to matters of which they lacked personal knowledge. There was no error.

## D. Jury Instructions

■■ DSHS next contends the trial court erred in instructing the jury, both as to instructions it gave and failed to give. We review the trial court's jury instructions under the abuse of discretion standard. *Safeway, Inc. v. Martin*, 76 Wn. App. 329, 332, 885 P.2d 842 (1994). A trial court does not abuse its discretion in instructing the jury, if the instructions: (1) permit each party to argue its theory of the case; (2) are not misleading; and (3) when read as a whole, properly inform the trier of fact of the ap-

plicable law. *Brown v. Spokane County Fire Protection Dist. 1*, 100 Wn.2d 188, 194, 668 P.2d 571 (1983). Even when an instruction given is misleading and therefore erroneous, reversal is not required unless prejudice can be shown, and such error is not prejudicial unless it affects or presumably affects the outcome of the trial. *Thomas v. French*, 99 Wn.2d 95, 104, 659 P.2d 1097 (1983).

■■ DSHS first excepted to jury instruction 15 as not supported by the evidence. Instruction 15 reads:

> If your verdict is for the plaintiff, then you must first determine the amount of money required to reasonably and fairly compensate the plaintiff for the amount of damages as you find were proximately caused by discriminatory acts of the defendants. . . . you should consider the following economic damages elements:
>
> . . . .
>
> In addition, you may consider the following non-economic damages elements:
>
> The natural and ordinary anxiety and depression incident to the discriminatory acts, if any, of the defendants.

DSHS excepted to the latter instruction as unsupported by the evidence and because there was no medical testimony regarding damages. DSHS did not except on the grounds that the instruction was an incorrect statement of the law as it seems to assert on appeal. Where an objection fails to apprise the trial court under CR 51(f), of the nature and substance of the objections, the issue will not be considered on appeal. *Walker v. State*, 121 Wn.2d 214, 217, 848 P.2d 721 (1993).

■ RCW 49.60.030(2), which discusses the types of damages recoverable from a wrongful termination case, states that:

> Any person deeming himself or herself injured by any act in violation of this chapter shall have a civil action in a court of competent jurisdiction to enjoin further violations, to recover the actual damages sustained by the person, or both,

together with the cost of suit including reasonable attorney's fees . . . .

Actual damages include emotional distress. *See Dean v. Municipality of Metro. Seattle*, 104 Wn.2d 627, 641, 708 P.2d 393 (1985).

DSHS argues that Herring did not present any medical evidence of his pain and suffering. Thus, he did not prove causation — that the employer's conduct proximately caused the emotional injuries he endured.

DSHS's reliance on *Xieng v. Peoples Nat'l Bank*, 63 Wn. App. 572, 821 P.2d 520 (1991), *aff'd*, 120 Wn.2d 512, 844 P.2d 389 (1993), is misplaced. *Xieng*, a bench trial, involved a claim for emotional and physical disability claims based on the employer's wrongful actions. Xieng claimed that the employer exacerbated a preexisting posttraumatic stress disorder by discriminating against him because of his national origin. The testimony from the psychiatrist went to the preexisting problem and how the employer's actions further injured Xieng. *Xieng*, 63 Wn. App. at 582-83.

Our Supreme Court has held that once wrongful termination is found, the discharged employee need only "offer" proof of emotional distress.

> Where emotional distress is asserted, this court has several times noted the distinction to be drawn between what is required for a finding of liability, and the recoverable damages resulting from an injury. In *Cagle* [*v. Burns and Roe*, 106 Wn.2d 911, 726 P.2d 434 (1986)], at 920, the court emphasized that once plaintiff proves defendant's intentional wrongful conduct (the tort of wrongful termination, in that case), plaintiff is only required to prove emotional distress in order to recover the damages attributable to the wrongful act.

*Nord v. Shoreline Sav. Ass'n*, 116 Wn.2d 477, 484, 805 P.2d 800 (1991) (citations omitted). The objective symptom requirement applies in cases where negligent infliction of emotional distress is asserted and goes to proof of liability, not damages. *Nord*, 116 Wn.2d at 485.

 Thus, upon a finding of wrongful termination, Herring need only offer proof of emotional distress in order to recover those damages attributable to the wrongful termination. *Cagle*, 106 Wn.2d at 920. Herring is not required to prove "severe" distress as DSHS maintains. *See Nord*, 116 Wn.2d at 483-84.

Here, the jury found that DSHS was liable for Herring's emotional distress based upon his wrongful termination. Further, the jury heard both Herring and his mother testify about the effects of the termination on Herring. This testimony, combined with the evidence of wrongful termination, justified the jury instruction. The trial court did not err.

DSHS next excepted to jury instruction 12. It asserted that no direct evidence was presented to support Herring's claim that his grievances were a substantial factor in his eventual discharge. RCW 49.60.210(1) states:

> It is an unfair practice for any employer . . . to discharge, expel, or otherwise discriminate against any person because he or she has opposed any practices forbidden by this chapter, or because he or she has filed a charge, testified, or assisted in any proceeding under this chapter.

 A party is entitled to instructions on the party's theory of the case if substantial evidence supports the theory. *Delahunty v. Cahoon*, 66 Wn. App. 829, 837, 832 P.2d 1378 (1992). "Evidence is substantial if it would convince an unprejudiced, thinking mind of the truth of the declared premise." *Jefferson County v. Seattle Yacht Club*, 73 Wn. App. 576, 588, 870 P.2d 987, *review denied*, 124 Wn.2d 1029 (1994).

 Under RCW 49.60.210, the employee bears the burden of proving that the employer's action was retaliatory and that such retaliation was the proximate cause of the employee's damages. *Delahunty*, 66 Wn. App. at 839. To prove proximate cause, the employee must prove that retaliation was a substantial factor behind the decision. *Allison v. Housing Auth.*, 118 Wn.2d 79, 95, 821 P.2d 34 (1991).

Herring filed three grievances against Turk. He objected to language in three earlier evaluations. He believed the language in the evaluations to be inflammatory and detrimental. The shop steward agreed, and the language was eventually stricken.

In another grievance, Herring requested an objective evaluation because of the violations of Personnel Policy 560, prohibiting the use of discriminatory language. He also requested a viewer for the second time. The grievance hearing officer denied Herring's request for an objective evaluation because: "Your supervisor is the only person in the office who has the knowledge, ability and responsibility to evaluate your performance."

That same day, Herring received a corrective action plan. Also that same month, DSHS conducted another unfavorable evaluation of Herring. Herring responded. Generally, the employee's response is attached to the evaluation and made part of the employee's record. Herring's response was never made part of the file. Furthermore, testimony at trial contradicted many of Turk's allegations that Herring's work was incompetent. Our review of the record discloses that there was sufficient evidence allowing the trial court to instruct on retaliation, and it did not err in doing so.

DSHS relies on *Binkley v. Tacoma*, 114 Wn.2d 373, 787 P.2d 1366 (1990). However, *Binkley* is not dispositive of the issue. The facts may be similar (in both cases, the employee filed complaints against the supervisor), but the applicable law is not. In *Binkley*, an employee brought a First Amendment claim regarding his employment, not a retaliation claim under RCW 49.60.210. The burden in *Binkley* was higher and more stringent because it involved balancing governmental concerns in matters of free speech. *Binkley*, 114 Wn.2d at 382-85.

DSHS further contends that the trial court erred by not submitting its proposed instructions 7 and 8

to the jury.[11] A trial court's refusal to give an instruction will not be reversed unless it was an abuse of discretion. *Safeway*, 76 Wn. App. at 332. Jury instructions should be read as a whole to ensure that they represent a party's theory of the case. *Jones v. Halvorson-Berg*, 69 Wn. App. 117, 124, 847 P.2d 945, *review denied*, 122 Wn.2d 1019 (1993). When a party's theory of the case is covered adequately by other instructions, additional instructions are viewed as superfluous. *Safeway*, 76 Wn. App. at 332. In order to give a requested instruction, there must be enough evidence that would convince an unprejudiced fair-minded person. *See Jefferson County*, 73 Wn. App. at 588.

Jury instructions 10 and 11 adequately cover the theory and instruction of DSHS's proposed instruction 8.[12] Similarly, the first part of proposed jury instruction 7 is

---

[11]Proposed jury instruction 7 states:

Under the laws of the state, it is an unfair practice for any employer to discriminate in terms of conditions of employment against any person because of a person's physical disability. It is an unfair practice for any employer to discharge any person from employment because of a person's physical disability.

The prohibition against discrimination because of a physical disability does not apply if the particular disability prevents proper performance of the particular job involved.

Proposed jury instruction 8 states:

You are instructed that in order for a disabled person to be otherwise qualified for a particular job, that person must be able to meet all of the program's requirements in spite of his disability by being able to perform all of the essential elements of a particular job.

[12]Jury instruction 10 reads:

Plaintiff claims he was discriminated against because of his disability and that defendants did not reasonably accommodate him.

In order to prevail on his claim of handicap discrimination by failure to provide reasonable accommodation, plaintiff must prove each of the following elements by a preponderance of the evidence:

(1) that he was disabled at the time of the alleged discrimination; (All parties agree this element has been proved)

(2) that he was otherwise qualified to perform the essential functions of the particular job;

adequately covered by jury instruction 9.[13] The second

(3) that with reasonable accommodation plaintiff could have performed the marginal functions of the job of SSI Facilitator;

(4) that the defendants failed to reasonably accommodate his disability;

(5) [t]hat the plaintiff's disability was a substantial factor in the defendant's determination not to provide him with reasonable accommodation;

(6) [h]e was damaged.

If you find from your consideration of all of the evidence that each of these propositions has been proved, your verdict should be for the plaintiff. On the other hand, if you find that one of these propositions has not been proved, your verdict should be for the defendants.

Jury instruction 11 reads:

A person "otherwise qualified to perform the essential functions of the particular job" is one who without accommodation can perform the essential functions of that job or position.

The term, "essential functions of the job" means the fundamental job duties of the position in question. The term does not include the marginal functions of the position.

The law requires that if a handicapped or partially disabled person can, without accommodation, perform the essential functions of the job or position, and with reasonable accommodation can also perform the marginal functions of the job or position, it is an unfair employment practice to terminate such a person if their disability is a substantial factor in their termination.

"Reasonable accommodation" has been defined as reasonable alterations, adjustments, or changes, including acquisition or modification of equipment or devices and similar actions which will enable an otherwise qualified person with a disability to perform a particular job or position successfully.

It is unfair employment practice for an employer to fail or refuse to make reasonable accommodations to the sensory or physical limitations of otherwise qualified employees, unless the employer can demonstrate that the employee has satisfactorily provided his own accommodation or that such an accommodation would impose an undue hardship on the conduct of the employer's business. The cost of accommodating an otherwise qualified worker will be considered to be an undue hardship on the conduct of the employer's business only if it is unreasonably high in view of the employer's business, the value of the employee's work, whether the cost can be included in the planned remodeling or maintenance, the requirements of other laws and contracts, and other appropriate considerations.

[13]Jury instruction 9 reads:

Under the law of the State of Washington, (RCW 49.60.010) Chapter 49.60 of the Revised Code of Washington, is known as the "law against discrimination".

RCW section 49.60.010 is part of Chapter 49.60 and it provides in part that the law against discrimination is:

part of the instruction, regarding nonapplication of the prohibition against discrimination if the disability prevents proper performance, is not contained within any one instruction specifically.

DSHS cites to RCW 49.60.180(1), which defines unfair labor practices, as its authority for its proposed instruction. RCW 49.60.180(1) specifically applies to hiring an employee, stating it is an unfair labor practice:

> To refuse to hire any person because of . . . physical disability . . ., unless based upon a bona fide occupational qualifica-

---

". . . for the protection of the public welfare, health, and peace of the people of this state, and in fulfillment of the provisions of the Constitution of this state concerning civil rights. The legislature hereby finds and declares that practices of discrimination against any of its inhabitants because of . . . the presence of any sensory . . . or physical handicap are a matter of state concern, that such discrimination threatens not only the rights and proper privileges of its inhabitants but menaces the institutions and foundation of a free democratic state.

\* \* \*"

RCW section 49.60.030 is also a part of Chapter 49.60 and it provides in the pertinent part:

"(1) The right to be free from discrimination because of any . . . sensory, . . . or physical handicap is recognized as and declared to be a civil right. This right shall include, but not be limited to:

(a) the right to obtain and hold employment without discrimination; . . . ."

RCW section 49.60.180 is also a part of Chapter 49.60 and it provides in the pertinent part:

"It is an unfair practice for any employer: \* \* \*

(2) To discharge or bar any person from employment because of . . . the presence of any sensory . . . or physical handicap.

(3) To discriminate against any person in compensation or in other terms or conditions of employment because of . . . the presence of any sensory, . . . or physical handicap; . . . ."

RCW section 49.60.210 is also a part of Chapter 49.60 and is generally referred to as the anti-retaliation section. It provides in the pertinent part:

"It is an unfair practice for any employer . . . to discharge, . . . or otherwise discriminate against any person because he or she opposed any practices forbidden by" the law against discrimination, Chapter 49.60, "or because he or she has filed a charge, testified, or assisted in any proceeding under" Chapter 49.60.

tion: PROVIDED, That the prohibition against discrimination because of such disability shall not apply if the particular disability prevents the proper performance of the particular worker involved.

RCW 49.60.180(1). The next section (2) applies to the discharge. The proviso in section 1 has been applied to all cases arising under RCW 49.60.180. *See Clarke v. Shoreline Sch. Dist. 412*, 106 Wn.2d 102, 117-18, 720 P.2d 793 (1986); WAC 162-22-050(3).[14]

Jury instructions 10 and 11 discuss the reasonable accommodation element and is defined in detail. Within the reasonable accommodation instruction and the instruction covering competence, there is implicit understanding that if the person cannot complete the essential functions of the job even with a reasonable accommodation, then the employer may discharge the employee.[15] Thus, the jury could have found in the negative on instruction 10, and then, consideration of the instructions as a whole would give the same effect as defense requested instruction 7. Another additional instruction would be superfluous. The trial court did not abuse its discretion.

For the first time in its reply brief, DSHS argues that the trial court denied it the opportunity to argue its theory of the case by not giving supplemental instructions 7 and 8. An issue raised and argued for the first time in a reply brief will generally not be considered on appeal. *See Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 809, 828 P.2d 549 (1992). The reason is that the opposing party has no chance to respond.

---

[14]DSHS cites to *Clarke* for factual similarities to Herring's case. Both employees had retinitis pigmentosa. But, in *Clarke*, the employee, a teacher, was responsible for overseeing several handicapped children. Clarke's vision impairment prevented him from adequately supervising these children even with reasonable accommodation (the help of teacher aides). Furthermore, Clarke did not take advantage of school district offers for various training opportunities. Therefore, the facts in *Clarke* are not dispositive.

[15]Determination of reasonable accommodation appears to be a precursor to finding it to be permissible to not hire or fire someone on the basis of disability. *Clarke*, 106 Wn.2d at 118.

DSHS further contends that the trial court erred in refusing to give its proposed instruction 6, which in pertinent part reads:

The laws of the State . . . allow a probationary state civil service employee, such as plaintiff, to be discharged during the probationary period, for any lawful reason.

You are instructed that the defendants . . . [DSHS] complied with all applicable state civil service laws and regulations in discharging . . . Herring.

At trial, neither party raised the issue that DSHS violated State civil service laws and regulations. The trial court did not give this instruction because it was not at issue:

THE COURT: There has been no contention here that there had to be cause for his discharge. The only contention here is that there was a violation of the anti-discrimination statute . . . .

MS. SUTTON: That's true, there is no requirement that a probationary employee be discharged for cause.

THE COURT: As I say, there is no issue here about that, is there? There is no issue in the case about whether or not he was discharged for cause within the meaning, the cause in the Civil Service Act?

MS. SUTTON: No.

THE COURT: There has been no contention they didn't follow the Civil Service rules?

MS. SUTTON: No, there isn't.

THE COURT: All right. Proceed.

Counsel for DSHS then proceeded with an exception to a different jury instruction number. Because the issue was not raised, the court did not err in refusing the instruction. *State v. Thompson*, 47 Wn. App. 1, 6, 733 P.2d 584, *review denied*, 108 Wn.2d 1014 (1987).

DSHS next contends that the trial court erred in not giving its proposed instruction 12 that the jury was not to

"second guess" good faith employment actions, even if it disagreed with the actions and found them to be unfair or unreasonable. DSHS asserts that absent this instruction, it could not argue its theory of the case. DSHS relies upon *Pannell*, 61 Wn. App. at 437, as authority. However, in *Pannell*, the appropriateness of the instruction was not addressed because the appellant did not properly except, and the instruction became the law of the case.

Moreover, even if proposed instruction 12 were a correct statement of the law, there is no evidence of prejudice to DSHS, and reversal is not appropriate. *Thomas v. French*, 99 Wn.2d 95, 104, 659 P.2d 1097 (1983). Here, a finding in the negative on any of the court's instructions regarding discrimination is impliedly a finding such as suggested by proposed instruction 12, and 12 is therefore superfluous. *Safeway, Inc. v. Martin*, 76 Wn. App. 329, 332, 885 P.2d 842 (1994).

DSHS next contends that the trial court erred by not giving its proposed instructions 11, 13, 14, and 15 regarding reasonable accommodation, special equipment and the disabled employee's duty to its employer. DSHS asserts that no comparable instructions were given, thus denying it the opportunity to argue its theory of the case.

Under WAC 162-22-080(1), the requirement of reasonable accommodation is set forth as follows: "It is an unfair practice for an employer to fail or refuse to make reasonable accommodations to the sensory, mental, or physical limitations of employees, unless the employer can demonstrate that such an accommodation would impose an undue hardship on the conduct of the employer's business." Furthermore, "employers have an affirmative obligation to reasonably accommodate the sensory . . . limitations of such employees unless the employer can demonstrate that the accommodation would impose an undue hardship on the conduct of the employer's business . . . the scope of an employer's duty to accommodate an employee's condition is limited to those steps reasonably necessary to enable the employee to perform his or her

job." *Doe v. Boeing Co.*, 121 Wn.2d 8, 18, 846 P.2d 531 (1993) (citing *Clarke*, 106 Wn.2d at 119).

Under the applicable law, the court's instructions 10 and 11 adequately address DSHS's concerns.[16] The trial court did not abuse its discretion.

### E. Attorney Fees at Trial

DSHS contends that the trial court abused its discretion by awarding Herring attorney fees in a lodestar amount plus 50 percent. Additionally, DSHS contends that the trial court awarded fees at an hourly rate of $200 for lead counsel and $175 for assistant counsel, when their respective billing rates are normally $125 and $100. DSHS asks that the attorney fee award be reduced.

"Generally, in order to reverse a fee award, it must be shown that the trial court manifestly abused its discretion." *Scott Fetzer Co. v. Weeks*, 122 Wn.2d 141, 147, 859 P.2d 1210 (1993). The lodestar approach sets attorney fees by "first determining the number of hours that were reasonably spent by the attorneys, multiplying it by a reasonable hourly compensation, and then adjusting this amount upward or downward based on additional factors." *Bowles v. Department of Retirement Sys.*, 121 Wn.2d 52, 72, 847 P.2d 440 (1993). The lodestar approach is often used in awarding statutory attorney fees. *Bowles*, 121 Wn.2d at 72. The *Fetzer* court states:

> A lodestar award is arrived at by multiplying a *reasonable* hourly rate by the number of hours *reasonably* expended on the matter. . . .
>
> . . . [F]actors [to consider in arriving at a figure] include:
>
> the time expended, the difficulty of the questions involved, the skill required, customary charges of other attorneys, the amount involved, the benefit resulting to the client,

---

[16]DSHS waived objection to this instruction. The trial court offered to rewrite its instruction 11 after hearing exceptions from both parties. The redrafted instruction provided all applicable definitions. The trial court then inquired if there were any objections, to which counsel for DSHS responded, "No."

the contingency or certainty in collecting the fee and the character of the employment.

*Fetzer*, 122 Wn.2d at 149-50 (citations omitted) (quoting *Dailey v. Testone*, 72 Wn.2d 662, 664, 435 P.2d 24 (1967)). The burden of proving the reasonableness of the fees requested is upon the attorney requesting the fees. *Blum v. Stenson*, 465 U.S. 886, 897, 104 S. Ct. 1541, 79 L. Ed. 2d 891 (1984).

The party requesting fees must provide reasonable documentation of the work performed. The trial court must then limit the lodestar amount to the hours reasonably expended to further the case. *Bowers v. Transamerica Title Ins. Co.*, 100 Wn.2d 581, 597, 675 P.2d 193 (1983).

Here, the parties dispute the complexity of the issues involved. Herring asserts the case was complex, but DSHS counters that the complexity was the result of lead counsel's inexperience, not the issues involved.

The trial court considered the appropriate factors in setting the attorney fee judgment. The trial court recognized that lead and assistant counsel's standard fees are $125 and $100 per hour respectively. The trial court then found DSHS's counsel's tendency of "stubborn and aggressive resistance to discovery" was a large factor in lead counsel's need for associate counsel. The trial court further noted that at the outset, it had little confidence that Herring would prevail, indicating there were difficult questions involved. Both lead and assistant counsel had to forgo other opportunities in order to prepare for trial. The trial court found that due to the questions involved and the skill required to perform the legal services, the lodestar rate of $200 per hour for lead counsel and $175 per hour for assistant counsel was appropriate. The trial court then reduced some of the claimed hours and concluded that its calculation was still less than the entitlement under the

agreed contingency fee. The trial court did not abuse its discretion.

### F. Herring's Motion for CR 11 Sanctions & To Strike Briefing

On May 10, 1995, Herring's counsel filed a motion for CR 11 sanctions against DSHS's counsel, claiming she misrepresented her offer-of-employment evidence. Herring moved to have both DSHS's opening and reply briefs stricken. In the alternative, Herring requested that the portions of the briefs related to this argument be stricken.

 Counsel may be subject to CR 11 sanctions "if three conditions are met: (1) the action is not well grounded in fact, (2) it is not warranted by existing law, and (3) the attorney signing the pleading has failed to conduct a reasonable inquiry into the factual or legal basis of the action." *Lockhart v. Greive*, 66 Wn. App. 735, 743-44, 834 P.2d 64 (1992); *Hicks v. Edwards*, 75 Wn. App. 156, 162, 876 P.2d 953 (1994), *review denied*, 125 Wn.2d 1015 (1995). The claim by Herring's counsel falls short because facts do support that DSHS's counsel tried to admit the evidence of the letter, but eventually failed to do so. She argued that the evidence was improperly excluded, a proper legal argument. Finally, counsel for DSHS did conduct a reasonable inquiry, but gave a different interpretation to the facts than Herring. Therefore, CR 11 sanctions are not warranted.

### II
#### HERRING'S APPEAL
#### A. Jury Instructions

Herring cross-appeals, assigning error to the trial court's failure to give certain jury instructions. Our disposition of this case obviates analysis of Herring's contentions.

#### B. Attorney Fees on Appeal

 Herring requests that he be awarded attorney fees on appeal as the prevailing party pursuant to RCW

49.60.030. *Burnside v. Simpson Paper Co.*, 66 Wn. App. 510, 533, 832 P.2d 537 (1992), *aff'd*, 123 Wn.2d 93, 864 P.2d 937 (1994). RCW 49.60.030(2) provides for recovery of attorney fees at the trial level and on appeal. As a terminated employee who prevailed in a wrongful discharge action, Herring would also be entitled to attorney fees under RCW 49.48.030, which provides for fees as long as the amount of recovery is greater than the amount admitted by the employer to be owing for wages and salary. *Hayes v. Trulock*, 51 Wn. App. 795, 806, 755 P.2d 830, *review denied*, 111 Wn.2d 1015 (1988). Herring is entitled to attorney fees on appeal, provided that he complies with RAP 18.1.

Affirmed.

SEINFELD, C.J., and MORGAN, J., concur.